# In the United States Court of Federal Claims

No. 13-499; 13-800
Filed: January 10, 2022

---

**LODGE CONSTRUCTION, INC.,**

*Plaintiff,*

**v.**

**THE UNITED STATES,**

*Defendant.*

---

*Michael H. Payne*, Cohen Seglias Pallas Greenhall & Furman, Philadelphia, PA, and *Edward Parrott*, Watt, Tieder, Hoffar & Fitzgerald, L.L.P., McLean, VA, for Plaintiff.

*John H. Roberson*, Senior Trial Counsel, with whom were *Steven Hough*, Trial Attorney, *Ioana Cristei*, Trial Attorney, *Deborah A. Bynum*, Assistant Director, *Martin F. Hockey, Jr.*, Acting Director, Commercial Litigation Branch, and *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## POST-TRIAL OPINION AND ORDER

**TAPP, Judge.**

"Men must turn square corners when they deal with the Government." *Rock Island A. & L.R. Co. v. United States*, 254 U.S. 141, 143 (1920) (Holmes, J.). In this case, the Court is presented with whether Lodge Construction, Inc. ("Lodge") fraudulently submitted cost claims to the United States. At trial, the United States showed that Lodge misrepresented the value of certain equipment, billing the United States for operating four off-road dump trucks collectively valued at over $3,500,000 when the trucks were actually worth less than $100,000 combined. The United States also demonstrated that Lodge designed a ratio to inflate its total equipment, labor, and overhead costs—a ratio through which Lodge, at times, billed taxpayers at rates between $2,000 and $22,000 per hour for work performed by a single laborer or piece of equipment. Lodge also manipulated that already-dubious ratio by seeking compensation for work performed on days outside of the claim period, often with nominal expenditures of manpower, effort, and resources. Those examples and others support the Court's conclusion that Lodge committed two violations of the False Claims Act when it certified and submitted two false claims to the U.S. Army Corps of Engineers ("the Army Corps").

This case should serve as a cautionary tale to government contractors. For those who seek to recoup sums of money from the Federal Government, and thus burden taxpayers, rudimentary recordkeeping and approximated claims are likely insufficient. When job cost data and recordkeeping are inaccurate, the claim will inevitably contain errors and the line between

negligence and reckless disregard for the truth becomes vanishingly thin. Cross it, and the government contractor's claim becomes fraudulent as a matter of law, a designation that carries financial, practical, and stigmatic consequences. Here, while some elements of Lodge's claims may reflect nothing more than slapdash formulae, overwhelming evidence establishes that substantial portions of those claims are patently deceitful.

It is now apparent that Lodge failed to earnestly undertake the obligations of claim certification: to ensure a claim submitted for payment is accurate and truthful. Lodge failed to accurately identify the equipment it used and support the valuation of that equipment with proper documentation in an act of deceit to increase its claim. Lodge used a dubious metric, riddled with errors, to measure its inefficiencies and dishonestly inflate Lodge's claims. Lodge employed an artifice through which it sought to inflate costs of its equipment by reporting operation hours to the Army Corps differently than it recorded them internally. And finally, Lodge sought double recovery of costs for which Lodge assumed the risk of increased operation.

Despite originally admitting its claims contained errors, Lodge later reversed course and doubled down on its claims. Perhaps as a feature of the latter strategy, Lodge made clear that its claims were not the product of a mistake but were intentional. However, Lodge's claims were also false. Lodge knew or should have known them to be false. And when a contractor acts intentionally or with reckless disregard for accuracy, submitting a false claim for payment is fraud.

## I.    Background and Procedural History

This case is procedurally complex. A brief overview will provide context to the findings of fact and conclusions of law. The dispute stems from a construction project to rehabilitate a levee in South Florida. The project was known as "Site 1 Impoundment Phase I" or simply "Site 1." Although Lodge's performance on that project is not directly at issue here, the Court reiterates the overview it provided in its recent opinion, *Lodge Constr., Inc. v. United States*, 153 Fed. Cl. 430 (2021).

In August 2010, the Army Corps awarded Lodge a competitively-bid fixed price contract to rehabilitate a levee in Palm Beach County—part of the Army Corps' broader "Everglades Update" restoration mission. The levee rehabilitation work required removal of the top layers of the existing levee slopes and replacement of those layers with soil cement and other mechanical means of shoring up the levee. (Joint Stipulation of Facts ("JSOF") ¶ 2, ECF No. 43). The levee was adjacent to the L-40 canal.



*Lodge Construction, Inc. v. United States, Case No. 13-499, Lodge's MSJ on Liability Ex. C, ECF No. 19-2*

Lodge divided the project area into six numbered sections, starting with Section 1 at the east end of the site. The project also required subsurface work, so Lodge constructed a temporary cofferdam so that it could perform that subsurface work "in the dry."[1] Lodge performed work a few feet above the groundwater table, so the project required significant dewatering efforts.

Pursuant to the solicitation, Lodge was required to submit a design based on the Army Corps' subsurface geotechnical site inspection and analysis. After revisions, the Army Corps accepted Lodge's final cofferdam design proposal in July 2011, and Lodge began work soon thereafter. In mid-March 2012, water breached two sections of the cofferdam's sheet pile wall in Section 2, flooding the project site.[2] After the failure, the Army Corps retroactively disapproved

---

[1] A cofferdam is "a watertight enclosure from which water is pumped to expose the bottom of a body of water and permit construction[.]" *Cofferdam*, Meriam Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/cofferdam (last visited Jan. 7, 2022). For an overview of the Army Corps' cofferdam and wet construction techniques, *see generally* Patrick O'Bannon, Working in the Dry: Cofferdams, In-River Construction, and the United States Army Corps of Engineers (United States Army Corps of Engineers, Pittsburg District, 2009) *available at* https://usace.contentdm.oclc.org/digital/collection/p16021coll4/id/156/ (last visited Jan. 7, 2022).

[2] Lodge maintains that the breach was caused by a differing site condition. The Army Corps, however, maintains that Lodge's cofferdam design was defective. Resolution of that issue is not ripe.

Lodge's cofferdam design. Lodge and the Army Corps corresponded over the next few months, and the Army Corps eventually sent Lodge a Cure Notice, demanding Lodge submit a revised cofferdam design by May 29, 2012 or be terminated for default.

Later in the summer of 2012, Lodge submitted three certified claims to the Contacting Officer. First, on June 21, 2012, Lodge certified and submitted its "Design Claim" related to the Army Corps' retroactive disapproval of Lodge's cofferdam design, stating:

> I [Cabot Lodge Dunn] certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which [Lodge] believes the Government is liable; and that I am duly authorized to certify the claim on behalf of [Lodge].

(JX104.008; JSOF ¶ 15). The "Design Claim" sought $679,279 in compensation and 63 additional calendar days to complete the work on Site 1. (JSOF ¶ 16). The Contracting Officer denied Lodge's Design Claim on October 29, 2012. (*Id.* at ¶ 17).

On June 26, 2012, Lodge, using identical language to its prior claim, certified and submitted its "Dewatering Claim" seeking $3,282,123 in compensation and 91 additional calendar days to complete the work. (JX108.53; JSOF ¶¶ 18, 20). Lodge premised this claim on three alleged conditions that impacted performance: (1) the failure of impounded water to percolate away from the project; (2) constructive changes the Army Corps made to the contract specifications; and (3) a differing site condition.[3] (JSOF ¶ 19). The Dewatering Claim asserted that inefficiencies attributable to those conditions were the Army Corps' responsibility; Lodge measured those inefficiencies using a ratio that it multiplied by a cost pool including operation costs for equipment such as off-road dump trucks, a soil cement batch plant, and dewatering pumps. (*Id.* at ¶ 21). The Contracting Officer denied Lodge's Dewatering Claim on December 28, 2012. (*Id.* at ¶ 22).

On July 6, 2012, Lodge, again using the identical language of its earlier claims, certified and submitted its "Wall Breach Claim" seeking $1,805,760 in compensation, alleging that a differing site condition caused the failure of Lodge's cofferdam design. (Case No. 13-800, Compl. ¶¶ 66–79, ECF No. 1; Case No. 13-500, Lodge's Mot. for Leave to Amend at 3, ECF No. 66). Lodge's Wall Breach Claim sought compensation for Lodge's estimated costs to fix the cofferdam's sheet pile failures. (Case No. 13-800 Compl. ¶¶ 66–79). The Contracting Officer denied Lodge's Wall Breach Claim on October 15, 2012. (USA MSJ on Fraud Ex. 11, ECF No. 20-4 (the Contracting Officer's final decision letter)).

The Army Corps ultimately terminated Lodge for default on July 23, 2012, and this litigation followed. Lodge, together with its surety (The Hanover Insurance Company), asserted causes of action that included each of these three Contract Disputes Act ("CDA") claims in separate complaints spanning four case numbers: Case Nos. 13-499, 13-500, 13-800, and 16-

---

[3] Percolation in this context refers to the tendency of water to pass through soil under the impoundment areas.

1187. *Hanover Ins. Co. v. United States*, 134 Fed. Cl. 51, 56 (2017). The Court consolidated these cases under Lead Case No. 13-500. *Id*. at n.1. On April 5, 2017, Lodge moved for leave to amend its Complaint in Case No. 13-800 to withdraw its Wall Breach Claim and increase its request for damages associated with its Design Claim to include costs incurred after Lodge had submitted its claim. *Id*. at 58. Lodge explained that "the [Army Corps'] termination of the contract prevented it from performing the work and incurring the costs set forth in its wall breach claim, and thus the wall breach claim should not have been included in the original [Case No. 13-800] complaint." *Id*. The Court granted Lodge's request and Lodge filed an amended complaint[4] in Case No. 13-800 on April 27, 2017. *Id*. The next day, the United States answered in all four cases, asserting as an affirmative defense that Lodge's claims (and those of its sureties) were "barred by illegality as a result of submitting a false claim." *Id*. The United States also requested, and the Court granted, leave to assert fraud counterclaims against Lodge, seeking forfeiture, damages, and civil penalties pursuant to the Special Plea in Fraud defense, 28 U.S.C. § 2514; the anti-fraud provision of the CDA, 41 U.S.C. § 604; and the False Claims Act, 31 U.S.C. § 3729. *Hanover Ins. Co.*, 134 Fed. Cl. at 58.

The United States' counterclaims accused Lodge of fraud in its submissions to the Contracting Officer and fraud in maintaining those claims in this Court. Specifically, the United States alleged fraud related to three categories of conduct: (1) false delay-day costs; (2) double-billing and exaggerated equipment costs; and (3) improperly passed-through claims of a subcontractor. (*See, e.g.*, Case No. 13-500, Def.'s Am. Answer and Counterclaims at 16, 19, 21, ECF No. 95). Over the next two years, the parties conducted discovery on the fraud issues. (*See, e.g.*, Case No. 13-500, Scheduling Order, ECF No. 153 (setting final deadlines for fraud depositions and expert reports)). This case was transferred to the undersigned on December 3, 2019. (ECF No. 16).

On October 26, 2020, by agreement of the parties, the Court dismissed certain claims by and against Lodge's surety. (Case No. 13-500, Order Transferring, ECF No. 204). In that Order, the Court also severed the cases that involved Lodge's surety and transferred those two cases, Case Nos. 13-500 and 16-1187, to the District of Massachusetts, designating Case No. 13-499 as the new lead case. (*Id*.). The Court then directed the parties to file partial summary judgment briefs regarding both Lodge's affirmative CDA claims against the United States and the United States' fraud counterclaims against Lodge. (*See* Docketing Order, ECF No. 18).

On April 14, 2021, this Court denied summary judgment on all issues and dismissed the United States' counterclaim under 41 U.S.C. § 604 for lack of subject matter jurisdiction. *Lodge Constr., Inc.*, 153 Fed. Cl. at 440. The Court then set this matter for trial on two of the three fraud allegations—the false delay-day costs and the exaggerated equipment costs—setting aside the pass-through claims issue for further proceedings. (ECF Nos. 32, 47).

Beginning August 2, 2021, the Court conducted a trial on the two fraud issues. Trial

---

[4] Lodge filed several amended complaints across the various case numbers pertaining to this litigation. Here, the Court refers to the Amended Complaint Judge Sweeney permitted to be filed in Case No. 13-800—the case she identified as "Lodge II"—but docketed as ECF No. 74 in Case No. 13-500.

concluded on August 6. On August 30, 2021, the parties simultaneously filed post-trial briefing. (USA Trial Brief, ECF No. 84; Lodge Trial Brief, ECF No. 85).

## II.    Findings of Fact

Lodge's alleged fraudulent conduct can be broken down into four categories. First, the United States asserts that Lodge fraudulently overvalued its Euclid off-road dump trucks, thereby inflating the costs Lodge billed to the Army Corps. Second, the United States alleges that Lodge fraudulently inflated its costs by manipulating both the numerator and denominator of its "inefficiency ratio"—an idiosyncratic numerical value that Lodge multiplied by a "cost pool" to capture alleged inefficiencies due to water on the project site. Third, the United States asserts that Lodge double-billed the Army Corps for costs relating to the ownership and operation of its "batch plant," a concrete manufacturing facility constructed on site. Fourth, the United States alleges that Lodge fraudulently included the operating costs of its dewatering pumps in its certified Dewatering Claim even though Lodge was already compensated for those costs through a fixed monthly price arrangement.

During trial, the Court heard testimony from seven fact witnesses—including Lodge employees, independent contractors retained by Lodge, representatives from the Army Corps and Lodge's surety—and four expert witnesses. Three trial witnesses were central to the Site 1 project and Lodge's certified claims: Cabot Dunn, Katrin Callaway, and William Gore.

Lodge is directed by Cabot "C.L." Dunn, the founder, president, and controlling shareholder of Lodge. (Dunn, TR at 813:13–1075:15).[5] By January of 2012, Mr. Dunn was the sole shareholder of Lodge.[6] The company did not undertake any significant financial transactions without his approval. (*Id.* at 814:13–17, 821:20–23). At the time of Lodge's performance on Site 1, Mr. Dunn had been at the company's head for 25 years. (*Id.* at 814:8–12). Through Lodge, Mr.

---

[5] A transcript of the trial is docketed at ECF Nos. 78–82. The Court will reference the witness's name in trial citations to reflect their time on the stand, but quotations may reflect questions or statements of counsel where appropriate. Discussions between attorneys and the Court will be noted as a "Colloquy."

[6] In this regard, the acts, knowledge, and intent of Mr. Dunn are effectively equivalent to the acts, knowledge, and intent of Lodge as a corporate entity, organized under Florida law. *Davies v. Owens-Illinois, Inc.*, 632 So. 2d 1065, 1066 (Fla. Dist. Ct. App. 1994) ("It is well settled that the actions of corporate directors and officers are attributable to the corporation itself."); *see JJJ Corp. v. United States*, 576 F.2d 327, 338 (Fed. Cir. 1978) (holding that in tax cases, "[t]he corporate purpose or intent [is] measured by the purpose or intent of its board of directors and officers[.]"); *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) ("[T]to determine whether a corporation made a false or misleading statement with specific intent to defraud, we look to the state of mind of the individual corporate officers and employees who made, ordered, or approved the statement."); (*see also* Compl. at ¶ 1, ECF No. 1). The Court does not, at this stage, make any determination as to whether the corporate entity may be disregarded. Whether or not the corporate veil may be pierced requires a more searching inquiry. That issue is not before the Court.

Dunn had substantial experience performing construction contracts valued in the tens of millions of dollars; over the course of his career, he has worked on hundreds of millions of dollars' worth of construction projects. (*Id.* at 814:18–815:7). To say Mr. Dunn was an experienced businessman in the field of construction is an understatement.

Although concepts utilized in private construction projects and government construction projects largely overlap, Mr. Dunn's experience with government contracts was limited in some respects. However, Mr. Dunn was not a novice federal contractor. Mr. Dunn had experience with submitting applications for payment to government entities. (Dunn, TR at 816:7–14). He previously worked on several heavy site civil construction projects for government entities, including the construction of several post offices and projects for the South Florida Water Management District. (*Id.* at 816:24–817:21). At the same time Lodge worked on Site 1, Lodge constructed a library in downtown Fort Myers pursuant to another federal contract. (*Id.* at 818:4–21). Site 1 was the first project in which Mr. Dunn had bought or sold heavy construction equipment.[7] (*Id.* at 819:2–25). Mr. Dunn signed and certified each of the claims Lodge submitted to the Army Corps. (JSOF ¶ 23).

Katrin Callaway was also central to the Site 1 project and Lodge's claims. Ms. Callaway worked for Lodge as an independent contractor. (Callaway, TR at 214:13–505:15). Ms. Callaway earned an oceanic engineering degree in 1995 and began working with construction firms in 1996. (*Id.* at 216:9–16). With the South Florida Water Management District, Ms. Callaway learned how to use Primavera, a construction scheduling software program. (*Id.* at 217:2–13). Lodge retained Ms. Callaway in 2010 to prepare construction schedules for the Site 1 project using Primavera. (*Id.* at 218:10–219:13). She prepared Lodge's original baseline schedule and modifications throughout the project. (*Id.*). Ms. Callaway also assisted in preparing the project updates and, in concert with Mr. Dunn and Paul Perkins, a retained construction consultant with Army Corps experience, prepared the inefficiency ratio portion of Lodge's Dewatering Claim. (*Id.* at 219:2–5, 223:14–224:3).

Lastly, beginning in 2011, William "Bill" Gore served as the project manager for Lodge. (Gore, TR at 513:20–656:8). Mr. Gore earned a civil engineering degree, has significant civil construction experience, and helped Lodge prepare its bid for the Site 1 contract. (*Id.* at 516:8–23). As the project manager for Site 1, Mr. Gore estimated the cost of dewatering for the project, particularly with respect to the dewatering pumps. (*Id.* at 516:24–517:14). During the project, Mr. Gore was responsible for preparing and submitting pay estimates to the Army Corps. (*Id.* at 522:5–14). Mr. Gore left Lodge in 2012 and did not directly prepare Lodge's certified claims but did assist through discussions with Paul Perkins and Cabot Dunn. (*Id.* at 518:2–25, 519:3–52:19). In fact, Mr. Dunn "made a conscious decision" to exclude Mr. Gore from reviewing the final version of the Dewatering Claim. (*Id.* at 521:1–9).

---

[7] In this context, the parties understood "heavy equipment" to mean construction vehicles such as bulldozers, dump trucks, and backhoes.

### A. Euclid Dump Trucks

Lodge used four oversized off-road "Euclid" dump trucks, at least one of which was more than 20 years old and the newest was more than 15 years old, to move material for this project. Lodge included costs associated with the use of those trucks in its Dewatering and Design claims. (JSOF ¶ 33; *see, e.g.*, JX109.116 (Dewatering Claim costs); JX104.146 (Design Claim costs)). Specifically, Lodge's Euclid truck costs total $229,459 of the $1.6 million owned equipment cost pool. (JX119.016, .110). Lodge arrived at this total by billing each of its four Euclids to the Army Corps at operating rates of $133.89 per hour and standby rates of $31.71 per hour. (JSOF ¶ 35). Lodge derived those rates by referencing the U.S. Army Corps of Engineers equipment manual ("USACE Manual"). (*Id.* at ¶ 36; JX001 (USACE Manual)). However, in referencing the manual, Lodge compared the rates it derived from third-party equipment costing software program (Equipment Watch) to USACE Manual rates without regard to whether the rates corresponded to comparable equipment. More bluntly, the rates Lodge gleaned from the USACE Manual were for equipment that materially differed from the Euclids.

Lodge first utilized Equipment Watch, a job costing software program used within the construction industry, to estimate the rates for its Euclids. (JX001.411; Dunn, TR at 1014:2–12, 1014:21–1015:1; PX116). Equipment Watch provided an operating rate of $138.27 per hour for the Euclids, which Lodge used in its project costing ledger. (JX118.153). Lodge then compared the Equipment Watch rate to rates for other equipment listed in the USACE Manual, determined the Manual rate most similar in dollars per hour, and used the USACE Manual rate ($133.89) in its claims. (JSOF ¶ 38; Dunn, TR 1035:21–1036:9).[8] Lodge then used those converted rates to determine project costs for the Euclids to submit its certified Dewatering and Design claims, despite Lodge's knowledge that the USACE Manual rates were *mandatory*, not simply guidelines. (JX069; JX083; Rousseau, TR at 169:6–19; Perkins, TR 712:6–713:1; JX060; DX209).

The Federal Acquisition Regulations ("FAR") specify how contractors must calculate equipment ownership and operating rates. FAR § 31.105 gives a contractor several options to determine equipment rates, including using "[p]redetermined schedules of construction equipment rates[.]" FAR § 31.105(d)(2)(i). That section also provides several examples, including "the Construction Equipment Ownership and Operating Expense Schedule published by the U.S. Army Corps of Engineers, industry sponsored construction equipment cost guides, *or* commercially published schedules of construction equipment use cost[.]" FAR § 31.105(d)(2)(i)(B) (emphasis added). Lodge chose to report its equipment ownership and operating rates using the USACE Manual, therefore it was bound to follow the instructions contained therein.

The USACE Manual contains requirements for how contractors must use it to establish operating rates for equipment. Table 2-1 of the USACE Manual contains specific equipment codes and lists operating rates for those pieces of equipment. (JX001.033). If a piece of

---

[8] The USACE Manual rate that most closely resembled the rate Lodge derived from Equipment Watch and assigned to the project cost was for a 2006 773D Caterpillar Truck, purchased new in 2006. (JX001.252).

equipment is not listed, the USACE Manual provides alternative methodologies for calculating operating rates. (JX001.337). Specifically, the USACE Manual allows contractors to select a piece of equipment that has very similar operational specifications *and value*, or else directs them to use the "CHECKRATE" spreadsheet to calculate operating costs:

> [I]f the contractor's *actual* equipment is not listed in tables 2-1 and 2-2, an equivalent piece of equipment may be chosen from the tables. *To be considered equivalent, the contractor's equipment must be no more or less than 10 percent of the configuration (size, capacity, and horsepower) and value* as compared to the equipment in tables 2-1 and 2-2. In either case, if the equipment is not equivalent, the equipment rate *must* be calculated using the methodology in chapter 2.

(JX001.337–338 (emphasis added); *see also* Rousseau, TR at 147:12–24; Schaeb, TR 1163:4–1165:21).

Lodge charged Adam Rousseau with equipment costing for the certified claims, but he did not recall who set the rates for the Euclid trucks and did not verify their accuracy. (Rousseau, TR at 169–171:18). Adam Rousseau worked for Lodge from early 2011 to mid-2012. (*Id*. at 135:9–208:22). During the Site 1 project, Mr. Rousseau worked as a laborer and then in an office managing timesheets and daily construction reports. (*Id*. at 139:7–19). When working in the office, Mr. Rousseau worked directly for Mr. Dunn. (*Id*. at 139:20–140:7). In preparing Lodge's Dewatering Claim, Mr. Dunn relied on Mr. Rousseau's compilation of equipment operating costs. (*Id*. at 141:11–144:19). Mr. Rousseau did not have significant construction or government contracts experience prior to his employment with Lodge. (DX172; Rousseau, TR at 137:2–138:20).

Mr. Rousseau knew that Lodge was required to use the CHECKRATE spreadsheet or the USACE Manual to arrive at operating rates for the Euclids. (DX237; Rousseau, TR at 151:5–12, 152:7–153:19, 169:6–19). Mr. Rousseau was responsible for entering data in the CHECKRATE formula to compute operating rates but could not recall checking the accuracy of rates provided to him. (Rousseau, TR at 170:3–25). Either Mr. Rousseau was aware, or through a minimum examination he would have discovered that Lodge used operating rates for equipment purchased new in 2006 with a value exceeding $880,000 each. (Schaeb, TR at 1163:4–1164:10; JX001.252). In the USACE Manual, operating rates for newer equipment include both operation costs (such as fuel and maintenance) as well as ownership costs (such as depreciation and interest). (Schaeb, TR at 1161:13–1163:3).

In claiming equivalency, Lodge ignored the considerable discrepancy in value and age between the equipment it used, and the equipment Lodge claimed it used. The USACE Manual rate was based on a new vehicle; Lodge acquired used equipment. The USACE Manual rate pertained to 2006 models; Lodge's trucks were manufactured between 1988 and 1993. (Dunn, TR at 911:19–913:16; Schaeb, TR at 1164:11–1167:20; JX072.5–.8). The USACE Manual rate reflected equipment worth over $880,000; Lodge internally recorded that the purchase price of each Euclid was between $14,000 and $24,000. (Dunn, TR at 911:19–913:16; Schaeb, TR at 1164:11–1167:20; JX072.5–.8). Thus, the total purchase price Lodge listed for its trucks totaled

less than $100,000, yet Lodge billed for the costs of operating and owning trucks with a combined estimated value of over $3,520,000.

The USACE Manual assumes that equipment of that age would have been fully depreciated, thus the operating rates would necessarily be lower to reflect only direct costs of operation—fuel and maintenance. (Schaeb, TR at 1163:14–1164:10). Additionally, the decreased value of older equipment necessarily reduces interest costs. (*Id.*). Lodge used USACE Manual rates for a piece of equipment with a large discrepancy in both value and age from the actual equipment deployed on the project. The misrepresentation in equipment type and value renders the claim false with respect to the Euclid operating rates.

Lodge's selection of the false operating rates for its Euclids was intentional. Lodge did not provide the Army Corps with an explanation of its method for arriving at the operating rates for the Euclids. (Dunn, TR at 907:2–908:4). For the purposes of litigation, Lodge has taken the position that the rates reflect capital improvements to the Euclids, increasing their value. (Order on Mot. in Lim. at 5, ECF No. 72; Case No. 13-499, Lodge Ans. To CCs at ¶ 155, ECF No. 102 ("Lodge admits that it utilized rates for more recently purchased equipment but did so to account for the recent repairs and rebuilding of the engines performed by Lodge on its equipment.")). However, Lodge has produced no documentation whatsoever showing the exact cost and nature of those improvements and refused to estimate the increase in the capital value of the Euclids. (Dunn, TR at 913:17–917:14).

Nor did Lodge adduce testimony that established any notable capital improvement to its aged Euclids. The absence of such testimony is telling. Other than vague allusions, Lodge did not produce a single receipt, invoice for parts, or mechanic who could substantiate that *any* repair or improvement had occurred much less a degree of improvement which would render twenty-year-old vehicles the functional equivalent of similarly sized vehicles manufactured in 2006 collectively valued at several million dollars. Moreover, what little testimony that was presented established that Lodge "cannibalized"[9] one of the four Euclids for parts to repair the other three Euclids. (Dunn, TR at 918:12–919:2). Lodge also valued this vehicle, despite it being stripped for repairs to the other three Lodge trucks, as if it were also of a different make and newer 2006 model valued at over $880,000.

Lodge acquired the Euclids in used condition through a related party financed transaction, subject to a lien from SunTrust Bank. (Rousseau, TR at 161:8–16; Dunn, TR 904:22–906:8, 910:14–23). In its internal equipment records, Lodge listed a purchase price for each of the four Euclids between $14,000 and $24,000. (JX072.5–.8). After Lodge's involvement in the project, SunTrust Bank sought to force a sale to satisfy its lien on the Euclids. Lodge entertained offers of approximately $40,000 for all four Euclids together. (DX397; Dunn, TR at

---

[9] Though Lodge takes issue with the use of the word "cannibalized" to describe what took place, the Court finds it an apt description. Lodge dismantled one Euclid and used those parts to repair and maintain the other three, leaving the "cannibalized" Euclid in other than sound working condition. (Dunn, TR at 918:9–23); FAR 31.105(d)(2) (equipment must be in "sound workable condition").

925:12–928:9). Lodge was aware that this represented a fair objective value for that equipment. (Dunn, TR at 928:5–9).

Lodge understood that the Army Corps would likely view its operating rates as a misrepresentation. In fact, Paul Perkins—the consultant Lodge hired to assist in preparing its certified claims—warned Lodge that the Euclid operating rates utilized in its Dewatering Claim were inflated.[10] (JX068; Dunn, TR at 921:17–923:17; Perkins, TR at 661:16–786:14). Mr. Perkins advised Lodge that, because the trucks were fully depreciated, the operating rates from the USACE Manual would not provide a sufficient basis for Lodge's equipment costs as part of its Dewatering Claim. (Perkins, TR at 715:11–719:3). And he also cautioned that using Equipment Watch or similar rates was an inappropriate method for calculating equipment costs. (Perkins, TR at 712:6–713:1; JX060). Despite these warnings, Lodge knowingly and intentionally submitted a certified claim containing inflated rates. (Dunn, TR at 1066:7–1067:20 (Cabot Dunn stating that despite Paul Perkins' advice, he "made a call" to use the inflated rates because he "felt like the Euclids were closer to new than they were used[.]")). But, as mentioned previously, Lodge made no effort to justify this belief or seek the Army Corps' approval. (Dunn, TR at 907:2–908:4, 913:17–917:14). Mr. Dunn's subjective belief as to the value of Lodge's trucks is irrelevant, belies any error in Lodge's submission of erroneous operating rates, and contradicts Lodge's previous legal arguments. (*See, e.g.,* Case No. 13-500, Lodge's Opp. to Mot. for Leave at 22, ECF No. 84 ("Lodge should have adjusted the published rates to account for the age and actual purchase price of the dump trucks.")).

In addition, the notion that Mr. Dunn possessed that subjective belief related to the value of the Euclids is not credibly supported by the evidence. Mr. Dunn is a "seasoned and experienced businessman" with knowledge of how markets dictate the objective fair value of assets. (Dunn, TR at 818:23–25, 924:4–925:5). Following Lodge's termination from the project, in advance of a construction equipment auction market, a broker offered Lodge $40,000 for the four Euclids together—an arm's length transaction. (DX397; Dunn, TR at 925:12–928:9). Mr. Dunn was aware of this offer and considered it reasonable in a "depressed market in 2013[.]" (Dunn, TR at 928:5–9). He understood that the operating rates Lodge submitted to the Army Corps were based on equipment purchased new in 2006 and valued in excess of $880,000. (*Id.* at 919:9–921:11). In light of this evidence, Lodge's $880,000 valuation of each of the four Euclids is not the product of a mistake; it is knowing, intentional, and duplicitous.

### B.   The Inefficiency Ratio

Lodge's Dewatering Claim alleged that the United States should be held partially responsible for higher-than-expected water levels on the project site which delayed Lodge's progress. (*E.g.*, Case No. 13-500, Lodge Am. Compl. at 3–8, ECF No. 74; *see also* JX109.211 (explaining that the ratio was based on "[t]he construction inefficiencies encountered as a result

---

[10] Mr. Perkins earned a degree in geology and joined the Army Corps shortly after graduating college. (Perkins, TR at 667:12–668:3). Mr. Perkins has experience in reviewing certified claims as a member of the Army Corps, and in submitting certified claims through his work as a consultant. (*Id.* at 669:2–7). Mr. Dunn relied on Mr. Perkins's expertise with respect to preparation and submission of Lodge's certified claims. (*Id.* at 669:8–12).

of the inability to effectively dewater the site[.]")). Lodge attempted to account for alleged inefficiencies on the project by applying a unique "inefficiency ratio" to a pool of overhead, labor, and equipment costs accrued between July 6, 2011 and January 14, 2012. (JX109.209). This inefficiency ratio was developed and applied by Ms. Callaway. (Callaway, TR at 219:2–8).

Ms. Callaway developed Lodge's baseline schedule contained in its bid and the subsequent modifications during performance. (*Id*. at 219:9–13, 222:11–122). She also assisted Mr. Dunn and Mr. Perkins with the preparation of the certified Dewatering Claim that Lodge submitted to the Army Corps. (*Id*. at 241:13–214:15, 265:12–23). In fact, Ms. Callaway was primarily responsible for preparing the delay analysis Lodge used in its Dewatering Claim. (*Id*. at 258:8–15). The Dewatering Claim relied on Ms. Callaway's baseline schedule, as well as the modifications and the "inefficiency ratio" that Ms. Callaway created to measure the impact of project delays due to water. (JX109.213). This was the first time Ms. Callaway had utilized an inefficiency ratio in presenting claims to the Army Corps. (Callaway, TR at 255:14–22). Ms. Callaway's inefficiency ratio was unique to Lodge's claims. (*Id*. at 490:17–24).

The inefficiency ratio was intended to measure the impacts of excavation work in Section 1 of the project. (JX109.208).[11] In the baseline schedule, Section 1 was 2,500 linear feet, but Lodge made a "management decision to limit Section 1 to only 2,000 linear feet" in order to "get the production work going." (JX109.209). This adjustment is important to note because it reduces the days allocated to work in Section 1 in the baseline schedule. (*Id*.). Ms. Callaway produced the ratio by placing the "actual days" of work over the "baseline allocated days." (*Id*.). She tallied 285 "actual days" and 115 "allocated days" to calculate an inefficiency ratio of 2.478 or 247.8%. (*Id*.). In simple terms, this ratio indicated that Lodge spent approximately 2.5 times longer than expected to do the work in Section 1. (Schaeb, TR at 1150:18–1151:13).

Construction Inefficiency Ratio Calculation

A. Baseline Allocated Days (2,500 LF): 115
B. Actual Days (2,000 LF): 285

Ratio (B./A.) = 2.478 (247.8%)

*Lodge Construction, Inc. v. United States Trial Exhibit: JX109.209*

Ms. Callaway's testimony is suspect. At a minimum, her status as an independent fact witness is improbable. Aside from the inconsistent responses and flawed recollection at trial, several other issues during trial raise questions about the integrity of Ms. Callaway's testimony. Ms. Callaway represented that one of the law firms representing Lodge was her client and paid her $150 per hour for preparation in advance of trial and her testimony as a fact witness. (Callaway, TR at 382:13–383:1).

---

[11] As mentioned previously, Lodge originally divided the project into six sections, each 2,500 feet in length. The cofferdam failed in Section 2. (*See* Lodge's MSJ on Liability, Ex. C).

Curiously, just prior to an overnight break in the trial, Lodge's counsel—Edward Parrott—represented that his firm had an attorney-client relationship with Ms. Callaway which allowed him to speak with her during the intermission. (*Id.* at 293:1–17). Ms. Callaway later clarified that Mr. Parrott's firm represented her without charge. (Callaway, TR at 382:13–22). That dynamic, where a lay witness is both a client of a law firm at no cost *and* providing services for which the firm is compensating her for testimony on issues relating to her involvement in a fraudulent scheme, is unusual and concerning.

While "it is not improper to pay a witness's expenses" incident to testimony at trial, the arrangement here raises eyebrows. *See* Model Rules of Pro. Conduct Rule 3.4(b) and cmt. 3 (Am. Bar. Ass'n 9th ed.); ABA Formal Ethics Op. 96-402 (1996) (nonexpert witness may be compensated for time spent attending trial or deposition or preparing for testimony if payment not conditioned upon the content of testimony and does not violate any law). The fact that Ms. Callaway believed the law firm representing Lodge and questioning her at trial to be her "client," while the law firm simultaneously asserted that it represented her legal interests, is a curious arrangement. Although the parties submitted bench memos regarding the propriety and admissibility of Ms. Callaway's testimony, (ECF Nos. 73 & 74), the only conclusion the Court draws is that Ms. Callaway is not an objective broker of fact. *See United States v. Beard*, 761 F.2d 1477, 1481 (11th Cir. 1985) (Even when a fact witness swears to testify truthfully, receiving compensation impacts credibility); *cf. U.S. v. Cervantes-Pacheco*, 826 F.2d 310, 316 (5th Cir. 1987) ("Finally, the trial court should give a careful instruction to the jury pointing out the suspect credibility of a fact witness who has been compensated for his testimony."). The Court's conclusion is bolstered by the content of Ms. Callaway's testimony.

In addition, during an overnight intermission, an interaction between Mr. Parrott and Ms. Callaway regarding her testimony caused Ms. Callaway to feel "extremely uncomfortable," compelling Mr. Parrott to bring the matter to the Court's attention the following morning. (Callaway, TR at 318:12–320:12, 379:11–396:8). After its direct examination, the United States moved for sanctions and exclusion of Ms. Callaway's testimony. (*Id.* at 394:9–24). At the close of trial, the Court denied the United States' motion to exclude Ms. Callaway's testimony. (Colloquy, TR at 1439:16–1440:8). Later, during a break in Mr. Dunn's testimony, Mr. Parrott revealed that Ms. Callaway and Mr. Dunn had met during a break in the trial despite the Court's instructions that fact witnesses remain sequestered even after their testimony concluded. (Dunn, TR at 854:1–861:12). Though Ms. Callaway was not an employee of Lodge, Ms. Callaway and Mr. Dunn have a close personal and professional relationship. (*Id.* at 857:1–859:24). Mr. Dunn has worked with Ms. Callaway for "many years" and considers her a friend, speaking with her "frequently" outside of the context of this particular project. (*Id.*). Mr. Dunn and his counsel both represented that during the overnight interaction, Mr. Dunn and Ms. Callaway did not discuss the trial. (*Id.* at 854:1–861:12).

Credibility determinations are solely within the province of the trial court sitting as the factfinder. *Medichem, S.A. v. Rolabo, S.L*, 437 F.3d 1157, 1171 (Fed. Cir. 2006) ("[D]eference is appropriately accorded to assessments of witness credibility because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.") (internal quotations omitted). The Federal Circuit has encouraged trial courts to look to the same hallmarks of credibility as those a jury would be instructed to consider. *Purifoy v. Dep't of Veterans Affairs*, 838 F.3d 1367, 1373 n.1 (Fed. Cir.

2016). Accordingly, the Court has assessed the credibility of Ms. Callaway according to several factors, including her demeanor at trial, her motives for obscuring the truth, her financial interests in a continued relationship with Lodge, and her interests in maintaining a personal relationship with Mr. Dunn, as well as the extent to which her testimony is consistent, plausible, and supported or contradicted by other evidence. *See* D.C. Std. Civ. Jury Instr. No. 2-9 (Credibility of Witnesses); Eleventh Circuit Pattern Jury Instructions (Civil) 3.4 (2020). Despite being an independent contractor, Ms. Callaway's personal relationship with Mr. Dunn and the financial relationship between Ms. Callaway, Lodge, and Lodge's law firm shade Ms. Callaway's credibility.[12]

### i.   The Calculation of "Actual Days"

The Dewatering Claim did not clearly explain what counted as an "actual day" for the purposes of the ratio's numerator. (JX109.208; Schaeb, TR at 1154:25–1155:10). Ms. Callaway offered conflicting explanations about what the "actual days" represented. She explained in a deposition prior to trial that "285" represented the actual days of work in Section 1 from start to finish. (Callaway, TR at 266:17–267:11).[13] At trial, she recollected that those days were based on activity in Section 1 as reflected in the "daily reports"—logs of labor and equipment work. (*Id.* at 268:12–269:1). In reality, the 285 days reflected "activity days," which Lodge tallied any time it recorded any labor or equipment hours, no matter how minimal, in any subsection within Section 1.[14] (*Id.* at 471:6–472:12; JX119.008). Using this scheme, Lodge could (and did) log multiple "activity days" in a single calendar day. (*See, e.g.*, Callaway, TR at 329:15–331:3 (logging five activity days on March 8, 2012)). Going further, Lodge's methodology allowed Lodge to count multiple activity days in a single calendar day when it spent just a few hours (or minutes) working.

Ms. Callaway recorded activity from the daily logs as tick marks in a "Production Values" spreadsheet. (JX095; Lodge's Mot. in Lim. Ex. B ¶ 7, ECF No. 69-1 (Affidavit of Ms. Callaway)). Basically, if a laborer or piece of equipment worked in a single subsection for any period at all, no matter how briefly, a tick mark was entered and later counted as a full activity day. Ms. Callaway struggled to consistently describe how she carried activity from the daily logs to the ratio. In a previous deposition, Ms. Callaway testified that she did not use the spreadsheet to prepare the ratio. (Callaway, TR at 267:17–271:20). At the deposition, she testified that it was

---

[12] Similar to Ms. Callaway, Mr. Perkins testified that he would be compensated by Mr. Parrott's firm as a fact witness while the same firm was representing him. (Perkins, TR at 662:8–664:3). The United States objected to Mr. Perkins' testimony. (*Id.* at 664:4–9). The Court denied the United States' motion to exclude Mr. Perkins' testimony, though it raises credibility concerns like those raised by Ms. Callaway's financial arrangement. (Colloquy, TR at 1439:16–1440:8).

[13] There are 192 calendar days, including weekends, between July 6, 2011 and January 14, 2012.

[14] Lodge actually divided Section 1 into subsections numbered alphabetically according to their position and whether they were on the north or south side. (JX119.008 n.13). For example, "Section 1AN" would denote the north side of the first subsection within Section 1 abutting the cofferdam, and "Section 1AS" would denote the south side of the same subsection.

"mere coincidence" that both the spreadsheet and Lodge's Dewatering Claim registered 285 actual days of work. (*Id.*). But just before trial, Ms. Callaway signed an affidavit stating that she reviewed the daily logs to prepare the spreadsheet and used the spreadsheet to prepare the ratio. (Affidavit of Ms. Callaway at ¶¶ 6–7; *see also* JSOF ¶ 49).

Several examples illustrate how Lodge's rudimentary methodology grossly inflated Lodge's inefficiency ratio. On March 8, 2012, Lodge counted five activity days for two hours and forty minutes of work in Section 1. (Callaway, TR at 336:18–25). On March 9, Lodge worked in Section 1 for 90 minutes and logged five activity days. (*Id.* at 343:9–16). On March 10, Lodge tallied seven activity days for nine hours of shoveling and raking by a single laborer and 10.5 equipment hours. (*Id.* at 347:12–349:20). On March 12, Lodge used one piece of equipment for three hours and logged two activity days. (*Id.* at 356:11–17). On March 13, Lodge counted four activity days for 13.5 hours of equipment time. (*Id.* at 368:8–13). On January 20, 2012, Lodge recorded two activity days but has no record of performing work in Section 1 that day. (*Id.* at 370:25–3713). On February 10, Lodge counted two activity days justified by 50 minutes of bulldozer activity. (Callaway, TR at 375:19–22). Ms. Callaway repeatedly acknowledged that her methodology for counting "actual days"—aka, activity days—was not reasonable, accurate, or truthful, offering only that the misrepresentation was not intentional. (*See, e.g., id.* at 337:1–18, 343:13–344:8, 350:14–17, 357:14–359:9, 368:14–369:6).

In addition to the overcounts, Lodge's rudimentary and inconsistent methodology for recording activity days also led to undercounts. (*See* Lodge Trial Brief at 16). For example, on October 27, 2011, Lodge logged one activity day while recording 26 hours of work in Section 1. (Callaway, TR at 424:19–425:4; PX46–49). Ms. Callaway believed, without evidence, that the undercounted activity days would outnumber the overcounts. (*Id.* at 427:14–23). In addressing the issue of overcounts and undercounts, Ms. Callaway admitted that in calculating activity days her "methodology was flawed[.]" (*Id.* at 475:3–5).

As illustrated in the examples above, Lodge's method allowed Lodge to record multiple activity days in a single calendar day, even when minimally working in Section 1. Lodge's inefficiency ratio was not an appropriate measure of efficiency because it does not consider input, effort, or the resources and costs expended in an activity day. (Schaeb, TR at 1151:6–10). The Court finds that the testimony of a litigation consultant proffered by the United States, Eric Schaeb, was particularly helpful in conceptualizing the difficulties with Lodge's methodology.[15] Mr. Schaeb offered two salient examples that highlighted the conceptual problem with Lodge's methods. (JX119.009). In the first, Mr. Schaeb highlights that whether Lodge performed a certain amount of work within the same subsection mattered greatly:

> If Lodge performed 8 hours of embankment work on Section 1AN on a given calendar day, that is counted as 1 activity-day. However, if Lodge performed

---

[15] Mr. Schaeb focuses on costs, revenues, and damages in government contracts and construction matters. (Schaeb, TR at 1145:11–1213:6). He earned a degree in finance and management and was educated in the fields of accounting and cost calculations and methodologies. (JX119.031). At trial, the Court accepted Mr. Schaeb as an expert on quantification of damages, project cost accounting, and analysis of construction costs. (Schaeb, TR at 1145:25–1146:16).

> 4 hours of embankment fill work on Section 1AN in the morning and 4 hours of embankment fill work on Section 1CN in the afternoon, that single calendar day is counted as 2 "activity-days," 1 activity day for each section of the levee despite being the same number of man-hours and same overall level of effort.

(JX119.009). In the second example, Mr. Schaeb highlighted an even bigger problem with Lodge's formula. Lodge assumed that the amount of equipment or number of man-hours utilized were irrelevant to the tally of activity days:

> Lodge's counting method is also flawed because it treats every activity-day as equal regardless of whether 4 man-hours were worked or 40 man-hours were worked on an activity. An example of the problem with this approach can be shown with two different scenarios. In Scenario A, 8 laborers work 5 ten-hour work days to accomplish a task, or 400 man-hours. In Scenario B, 5 laborers work 10 eight-hour work days to accomplish the same task, also 400 man-hours. However, under Lodge's approach of only counting days worked rather than man-hours, Scenario B would be twice as inefficient (or half as efficient) as Scenario A because Scenario B took 10 days and Scenario A took 5 days.

(*Id.*).

Ms. Callaway is an intelligent and experienced professional with command of the mathematical principles involved here and a conceptual understanding of construction scheduling. (Callaway, TR at 216:9–218:13). Ms. Callaway understood that either increasing the activity days or decreasing the planned days would result in a higher ratio. (*Id.* at 247:24–248:4). Ms. Callaway also understood that an increase in the ratio directly increased Lodge's costs and therefore, the value of its Dewatering Claim. (*Id.* at 498:22–499:5). Moreover, Ms. Callaway never sought the Army Corps' guidance on the appropriate method to account for alleged inefficiencies. (*Id.* at 502:10–24).

Mr. Perkins was not initially consulted about using an inefficiency ratio to calculate the costs of project inefficiencies. (Perkins, TR at 780:20–781:8). When reviewing the Dewatering Claim in preparation for its submission to the Army Corps, Mr. Perkins advised Lodge that a blanket inefficiency ratio was inappropriate. (JX070.021–.022; Perkins, TR at 698:5–699:18). In fact, Mr. Perkins advised Lodge that if it did intend to use an inefficiency ratio, the ratio should be tailored to the equipment and effort expended and accompanied by a narrative explanation for each inefficiency factor. (JX070.022). Lodge did not adopt that cautionary approach.

Ms. Callaway carefully reviewed and considered the daily logs in creating the Production Values spreadsheet. (Callaway, TR at 473:1–18). The Court finds that Ms. Callaway's tally of activity days was not a mistake, but the intentional product of her methodology. Only when it would be untenable to deny did Ms. Callaway acknowledge the flaws in her methodology. But the mathematical and conceptual flaws were or should have been apparent to someone of Ms. Callaway's education and experience. The Court finds that Lodge's inflation of its inefficiency ratio using Ms. Callaway's methodology was knowing and intentional.

ii.   <u>Activity After January 14, 2012 and Erroneously Tallied Days</u>

In late January 2012, Lodge presented payment requests to the Army Corps that showed for "[b]illing purposes," work in Section 1 was complete as of January 14, 2012. (JX038; Callaway, TR at 278:2–281:10). Lodge's Dewatering Claim ostensibly sought compensation for inefficiencies in work performed between July 6, 2011 and January 14, 2012. (JX109.209). In preparing the inefficiency ratio Lodge used to calculate the value of its certified claim, Ms. Callaway referenced the Production Values spreadsheet. (JSOF ¶ 49). In doing so, she included 55 activity days in the numerator of the inefficiency ratio that correspond to work performed *after* January 14, 2012. (Callaway, TR at 269:12–270:12).

Ms. Callaway had some trouble consistently describing the nature of Lodge's work in Section 1 after January 14, 2012—the purported end date of Lodge's Dewatering Claim. In a pre-trial deposition, Ms. Callaway testified that Lodge performed minimal work in Section 1 after January 14, and that those days should not be counted as "actual days" for the purposes of the inefficiency ratio. (*Id.* at 287:14–19). At trial, after consultations with Lodge's counsel, Ms. Callaway amended her testimony to align with Lodge's litigation position—that work was performed after January 14, 2012 and activity days after that date were properly added to the numerator of the inefficiency ratio and incorporated in Lodge's Dewatering Claim. (*Id.* at 289:2–289:21). Prior to trial, Ms. Callaway testified that she did not use the Production Values spreadsheet to calculate activity days for the inefficiency ratio and the correlation between the spreadsheet and activity day total was a coincidence. (*Id.* at 270:3–271:20). Ms. Callaway then testified at trial that she used the Production Values spreadsheet to reperform her analysis by comparing the daily reports to her tick marks in the spreadsheet. (*Id.* at 324:7–325:24). Notably, Lodge did not provide the Production Values spreadsheet to the Army Corps in support of its claim. (Dunn, TR at 949:10–950:2).

The Production Values spreadsheet is the source of Ms. Callaway's activity days tally. That spreadsheet includes tallies for days after January 14, 2012. Lodge submitted the Dewatering Claim to the Army Corps with the knowledge that the inefficiency ratio included days outside the claim period and intended to be compensated for costs that it incurred outside the claim period. (Callaway, TR at 289:2–21). Ms. Callaway reviewed the daily reports after January 14, 2012 and intentionally added activity days outside the claim period. (*Id.* at 320:21–321:4). She was aware that Lodge would use her ratio to calculate costs Lodge was seeking from the Army Corps. (*Id.* at 321:5–16). Ms. Callaway's tally of days outside of the claim period and incorporation of those days into the inefficiency ratio was intentional, not the product of a mistake. She provided these activity day tallies to Mr. Dunn, thereby making him aware that the inefficiency ratio incorporated days outside of the claim period. (*Id.* at 274:2–275:4). Mr. Dunn also affirmed that inclusion of activity days outside the claim period was Lodge's intention, not a mistake. (Dunn, TR at 947:8–948:18).

iii.   <u>The P00009 Contract Modification</u>

Lodge's contract provided that Lodge was to complete the project within 720 days of the Army Corps' Notice to Proceed. (JSOF ¶ 3). The Army Corps issued the Notice to Proceed on October 20, 2010 fixing Lodge's deadline to complete the project as October 8, 2012. (*Id.*). After receiving the Notice to Proceed, Lodge divided the work into six sections. (*Id.* at ¶ 6). On June 6,

2011, the Army Corps issued Request for Proposal number 0005 ("RFP-0005") to consolidate excavation work in two separate line items into a single, new line item. (*Id*. at ¶ 9). CLIN 0007 was increased by 260,000 cubic yards, to a total of 554,300 from 294,300 cubic yards. (*See* JX061.002, JX113.002). CLIN 0021 was decreased by 260,000 cubic yards to balance out the increase to CLIN 0007 and complete the consolidation. (JX061.002). In July 2011, Lodge began pumping water from the Section 1 construction area into water impoundment areas. (JSOF ¶ 7). In doing so, Lodge experienced difficulties in dewatering Section 1 because the water in the impoundment areas failed to percolate away from the project as expected. (*Id*.).

After ongoing discussions about the material Lodge was expected to excavate in the new line item, Lodge submitted a formal Request for Equitable Adjustment ("REA") in October 2011. (*Id*. at ¶ 10). In December 2011, the Army Corps granted Lodge's request in part through contract modification P00009. (*Id*. at ¶ 11). P00009 authorized $1,990,000 in additional compensation for Lodge and 81 additional days for Lodge to complete the project, in effect creating a new, January 3, 2013 completion deadline. (*Id*.; JX061.030).

When Ms. Callaway adjusted the project schedule to account for the P00009 modification, she spread the additional 81 planned days across all six sections of the project. (Callaway, TR at 443:1–445:2; JX061.027–28). For Section 1A however, Ms. Callaway allotted additional time for evaluation of the site conditions. (Callaway, TR at 445:3–20; JSOF ¶ 44).

When Lodge prepared the inefficiency ratio as part of its Dewatering Claim, Lodge utilized the "original number of days from the baseline schedule which were intended for completion of 2,500 linear feet[.]" (JX109.209).[16] In its original baseline schedule, Lodge allocated 115 days to excavation in Section 1. Lodge used that figure in the denominator of its inefficiency ratio. (JX109.209). Because that figure came from the original baseline schedule, the figure did not account for the additional planned days the Army Corps granted Lodge in contract modification P00009. Lodge never sent the Corp a revised schedule incorporating the 81-day extension. (Callaway, TR at 240:6–18; Andres, TR at 1129:25–1130:3, 1132:2–11).

Lodge offered conflicting accounts as to whether it intentionally or mistakenly excluded P00009 from its inefficiency ratio. At trial, the Court accepted three statements from Lodge's prior filings as party admissions. (Colloquy, TR at 316:25–317:16). In Lodge's Opposition to the United States' Motion for Leave to File Amended Answers Asserting Counterclaims in Fraud (Case No. 13-500, ECF No. 84), Lodge admitted that it should have accounted for contract modification P00009 in its inefficiency ratio: "Lodge acknowledges now, as Ms. Callaway did at her deposition, that Lodge's calculations should have taken into account, to some degree, the 81 days provided by Modification P-00009. Lodge admittedly did not." (Case No. 13-500, Lodge's Opp. to Mot. for Leave at 23–24). Lodge claimed that this oversight was the product of a mistake: "Undoubtedly, Lodge did overlook the additional days provided by Modification P-00009 when calculating the impacts of the dewatering problems, but there is a reasonable

---

[16] As noted previously, Lodge reduced the length of Section 1 to 2,000 linear feet in order to expedite dry work in that section. Lodge noted that in calculating its inefficiency ratio, it did not prorate the number of days allocated to Section 1 commensurate with the reduction in linear feet of excavation. (JX109.209).

explanation for this mistake." (*Id.* at 24). Lodge urged the Court to accept that this mistake was justified because the project was in crisis: "Therefore, it is understandable that Lodge, while it was dealing with two major crises on the Project, overlooked the fact that the original durations in the schedules had not been updated to reflect the additional time given for them in Modification [P00009]." (*Id.*). Lodge's statements are consistent with Ms. Callaway's prior deposition testimony, in which she stated that it would have "[p]robably" made sense for Lodge to adjust its inefficiency ratio "to reflect that there had been extensions based on the REA" because Lodge "got credit for the time" through P00009. (Callaway, TR at 260:13–261:19).

However, these statements and Ms. Callaway's prior testimony are both at odds with her trial testimony. At trial, Ms. Callaway stated that it was her intent to exclude the 81 days granted by P00009 because the baseline schedule was "the correct schedule to use" for the inefficiency ratio. (*Id.* at 252:17–22). She stated that it was her intent to exclude those days specifically to show "the magnitude of the impact that Lodge experienced with the dewatering problem[.]" (*Id.* at 251:9–17). Ms. Callaway's trial testimony is consistent with contemporaneous emails from Mr. Dunn. On April 15, 2012, Mr. Dunn emailed Ms. Callaway asking her to transmit a December progress schedule that omitted the 81 days granted by P00009 because, in Mr. Dunn's view, omission "would best represent the time impact portion of the REA." (JX094). The Court finds that Lodge knowingly and intentionally excluded the 81-day contract extension granted by modification P00009 from its inefficiency ratio denominator.

Underlying the United States' fraud claim with respect to P00009 is the implication that Lodge attempted to double-bill the Army Corps for work Lodge performed in Section 1. The United States contends that Lodge was compensated for the extension of time and additional work through P00009 then sought additional compensation by applying the inefficiency ratio to a cost pool in its Dewatering Claim. (USA Trial Brief at 32). And in applying an inefficiency ratio that failed to account for the P00009 modifications, the ratio was inflated, thereby inflating the Dewatering Claim. (*Id.*).

There is some ambiguity as to whether Lodge performed any work in Section 1 *pursuant to* P00009. In consideration of the additional compensation and time Lodge received to complete the project, Lodge was expected to excavate an additional 260,000 cubic yards of material across the project. (*See* JX061.0001). But Lodge never finished performance on the baseline scope of work or started billing the new line item for the increased scope of work. (Gannon, TR at 110:18–111:9; Dunn, TR at 1065:20–22, JX113.002 (Lodge's final pay application showing 104,958 cubic yards excavated)). And Lodge was insistent that, though it was unclear where the extra P00009 excavation would have occurred, it would have been outside of Section 1. (*Compare* Callaway, TR at 446:10–22, 453:8–454:6 *and* Dunn, TR at 1069:20–1070:20, 1071:9–15 *with* Gannon, TR at 104:8–105:1 (unable to refute Lodge's assertions regarding excavation in Section 1) *and* Andres, TR at 1138:13–1139:11, 1143:3–23 (same)). In sum, all that is clear is that though Lodge was authorized to bill for excavating 554,300 cubic yards in CLIN 0007, inclusive of the P00009 modification, Lodge only excavated and billed for 104,954 cubic yards prior to termination. (JX113.002). Thus, the Court cannot find that Lodge's work in Section 1 implicated P00009 through the added excavation material or the increased compensation authorization.

However, Lodge's work in Section 1 did implicate the extra *days* granted in modification P00009. (JX061.028). The Army Corps granted Lodge extra days of work in Section 1, which meant an increase to the cost pool through added equipment and labor costs and allocated overhead. In that way, Lodge incorporated P00009 cost impacts into its Dewatering Claim cost pool but failed to incorporate those days in the inefficiency ratio. (*See* Van Noy, TR at 1422:11–24 (discussing duplication of cost impacts)). Therefore, even if the Army Corps were not compensating Lodge by increasing the cubic yardage, the Army Corps was compensating Lodge by granting additional days during which Lodge added costs to its cost pool.

### C. Lodge's Batch Plant Costs

Part of the project involved reinforcing the levee with soil cement. To produce the soil cement, Lodge commissioned a "batch plant"—a stationary piece of equipment consisting of a bin for storage of soil material, scales, cement mixer, and a silo. (Gannon, TR at 72:23–73:8). The batch plant was powered by a generator. (*Id*. at 72:23–73:8). "The purpose of the batch plant was to mix water, Portland cement, and soil excavated from the site, to produce soil cement used to armor the levee." (JSOF ¶ 53). The batch plant was the largest and most valuable piece of equipment on the project. (Lester, TR at 1245:21–25).



Batch Plant completed assembly.

*Lodge Construction, Inc. v. United States Trial Exhibit: JX029.007*

Lodge's Dewatering and Design claims sought compensation for costs related to ownership and operation of the batch plant. (*See, e.g.*, JX109.116 (Dewatering Claim costs); JX104.146 (Design Claim costs)).

At trial, the United States raised three issues related to Lodge's treatment of the batch plant costs in its Dewatering and Design claims. First, the United States asserts that Lodge's inclusion of any batch plant ownership costs was fraudulent because the Army Corps reimbursed Lodge in full for the installation and commissioning of the batch plant. (USA Trial Brief at 39–40). Second, the United States takes issue with the operating rate at which Lodge billed the Army

Corps. (*Id.*). Third, the United States alleges that Lodge improperly calculated the hours of operation for the batch plant. (*Id.*). Each issue merits consideration.

i. Ownership of the batch plant

Through third parties, Lodge purchased the batch plant for $707,600 ($656,750 for the batch plant itself plus $50,850.31 for shipping and handling) and the generator for $110,372—a total of $817,972. (JSOF ¶¶ 55–56; JX048). Lodge purchased the batch plant from R&S Concrete Batch Plants, Loadcraft Industries Ltd. (Dunn, TR at 963:19–25). Lodge intended the batch plant to produce soil cement for use on the project. (Gannon, TR at 72:23–73:8). Soil cement is a compacted mixture of soil or aggregate, cement mix, and water. (Gore, TR at 603:1–6).

Lodge's arrangement with the Army Corps to purchase the batch plant was atypical. (Gannon, TR at 78:8–20; DX344.002). Lodge and the Army Corps reached an agreement by which the Army Corps would pay Lodge a total of $1,227,600 in two equal installments for purchase, installation, and commission of the batch plant. (JSOF ¶ 57). The Army Corps agreed to pay for the batch plant in advance to assist Lodge with the large up-front costs. (Gannon, TR at 78:21–25). Lodge financed $900,000 of the purchase price of the batch plant through SunTrust Bank. (JSOF ¶ 61). The Army Corps paid Lodge the first installment after Lodge mobilized the batch plant and paid the second installment after Lodge produced a trial batch of cement that met the contract's specifications. (*Id.*). The Army Corps paid Lodge in full for the purchase of the batch plant several months before Lodge submitted its certified claims. (*Id.* at ¶ 65).

Lodge billed and the Army Corps paid $1,227,600 in total through that arrangement. (*Id.* at ¶ 58). This is reflected in CLIN 0009, which Lodge understood "encompassed all the efforts to get that first trial batch installed." (JX028.012; Gore, TR at 528:11–18). Lodge made five progress payments toward the total cost of the batch plant, inclusive of shipping. (DX166). However, the final invoice from February 2011 indicates that Lodge still owed the batch plant vendor $215,037.81. (*Id.*). That invoice remained outstanding on August 12, 2011. (*Id.*). Mr. Dunn explained that Lodge withheld payment due to Lodge's issues in getting the batch plant certified as well as related back-charges and offsets. (Dunn, TR at 966:9–24). Lodge never paid that remaining balance. (*Id.* at 966:25–967:2). In addition, as of October 2012, Lodge owed SunTrust Bank over $500,000 on its loan to finance the purchase of the batch plant. (JSOF ¶ 64). SunTrust Bank eventually seized the batch plant due to Lodge's failure to pay down this loan. (Dunn, TR at 971:21–972:19). After Lodge's termination, the Army Corps paid SunTrust approximately $100,000 to keep the batch plant on site for the replacement contractor to use in completing the project. (Gannon, TR at 82:10–83:10).

CLIN 0009 also included production and placement of soil cement. (JX028.012). The production line item in CLIN 0009 encompassed extracting material to process it in order to produce the soil cement. (Gore, TR at 530:6–16). The placement line item within CLIN 0009 included actual production— "utilizing the batch plant to make the soil cement and place it on the levee." (*Id.* at 530:17–19).

Lodge made several capital improvements to the batch plant that were not contemplated in the purchase price. Because of the amount of water on the project site, Lodge experienced

unanticipated difficulties that plagued the operation of the batch plant. Lodge made modifications to the batch plant to improve the efficiency of soil cement production. (*Id.* at 648:7–12). Because of the amount of water on site, the soil material used to produce soil cement in the batch plant needed to be prepared for cement production. (*Id.* at 604:13–606:7). Specifically, the soil material was thick, sticky, and pasty, and resisted falling from the hopper into the cement mixer. (*Id.* at 604:16–605:7). Pneumatic gates on the hopper opened on a periodic timer to measure and control the flow of soil material into the mixer. (*Id.* at 605:7–17). Due to its consistency, the soil material resisted falling into the mixer as contemplated, leading to an imbalance of the three ingredients—Portland cement mix, soil, and water. (Gore, TR at 605:10–17). That imbalance affected the quality of the final soil cement product preventing the cement from being certified to the contract specifications. (*Id.* at 605:15–17). Therefore, Lodge made modifications to the batch plant and soil preparation process to improve the efficiency of soil cement production.

Lodge tried several techniques to improve cement production. One of those techniques was working the soil material by physically manipulating it—a technique known as "farming"— to allow the soil to dry out before placing it in the hopper. (*Id.* at 605:24–606:7). That technique proved inadequate. (*Id.*at 606:10–15). Lodge tried welding steel inside the hopper to create steeper angles—utilizing gravity to help material fall into the mixer—but that technique also proved inadequate. (*Id.* at 606:16–23). Lodge then directed laborers, using hammers, to beat on the side of the hopper to shake material loose so that it would fall into the mixer. (*Id.* at 606:24–607:3). The success of that technique inspired Lodge to install remote-controlled vibrators on the outside of the hopper walls to agitate the material so that it would fall into the mixer. (Gore, TR at 607:4–15). The combination of soil farming, adding steel plates, and installing vibrators finally proved adequate for Lodge to produce soil cement that met the contract's specifications. (*Id.* at 607:10–15). Lodge had not anticipated that soil cement production would require that level of effort and the improvements Lodge made were not contemplated in the purchase price of the batch plant. (*Id.* at 607:16–24).

### ii.  Batch Plant Operating Rate

In calculating its Dewatering Claim impacts, Lodge incorporated batch plant operation and standby costs from July 5, 2011 through January 14, 2012 in its cost pool to which it applied the inefficiency ratio. (JSOF ¶ 59). In calculating Design Claim impacts, Lodge included batch plant standby costs for the period of March 29, 2012 through May 30, 2012. (*Id*. at ¶ 60). Lodge claimed operating rates based on an hourly rental rate of $339.09 and standby costs of $56.16 per hour. (*Id*. at ¶ 62; *see also* JX109.097).

In preparing its Dewatering and Design claims, Lodge referenced its internal equipment costing records. (*Compare* JX083 (Weekly Costs Spreadsheet) *with* JX109.093 *et seq.* (Dewatering Claim) *and* JX104.146 *et seq.* (Design Claim)). Because the batch plant was a custom piece of equipment designed specifically for this project, Lodge originally obtained operating rates from Equipment Watch. (Dunn, TR at 1017:2–11). In June 2011, Equipment Watch provided Lodge with monthly, weekly, daily, and hourly operating cost rates for the batch plant. (JX051). Equipment Watch determined that the hourly operating rate for the batch plant was $339.09. (JX051). Throughout the course of the project, Lodge's internal equipment costing records listed the batch plant operating rate at $339.09. (JX083.004).

On March 13, 2012, in preparing to submit its Dewatering Claim, Lodge used the CHECKRATE spreadsheet to determine an operating rate of $235.88 per hour and standby costs of $56.16 per hour. (JSOF ¶ 63; JX081). That same day, Mr. Rousseau sent Mr. Dunn an email with his calculations of these rates at 12:43 PM. (JX081). Later that evening, at 11:53 PM, Mr. Dunn sent Adam and two others an updated spreadsheet containing, among other things, equipment cost rates. (JX083.001). Four days later, Mr. Rousseau commented on the updated spreadsheet and recommended some changes to operating rates which he flagged by highlighting the cells in the spreadsheet. (*Id.*). Importantly, Mr. Rousseau commented on Lodge's internal rate for a 1999 Bobcat in cell row 77, indicating his opinion that the hourly operating rate was surprisingly high. (*Id.*). The rate Lodge listed for the 1999 Bobcat was $235.88—matching exactly the rate Mr. Rousseau calculated for the batch plant using the CHECKRATE spreadsheet. (JX083.004). The equipment rate Lodge utilized for the batch plant—$339.09—was listed in the row of cells just above the 1999 Bobcat equipment information:



| Lodge Construction Owned Equipment Costs | Serial # | Hourly Standby Rate | 40 Hour Week Total Hours Standby This Week | Weekly Standby Costs Owned Equipment | Total Hours Operated This Weekly Period | Hourly Operating Rate | Weekly Operating Costs Owned Equipment |
|---|---|---|---|---|---|---|---|
| Terex TA27 Articulated Dump | A0051344 | $17.07 | 40.00 | $706.00 | | $49.34 | $0.00 |
| John Deere 644H Loader | DW644JX572800 | $9.76 | 40.00 | $390.40 | | $50.23 | $0.00 |
| Volvo EC460 Excavator | 13092 | $21.00 | 40.00 | $840.40 | | $92.80 | $0.00 |
| Euclid R50 End Dump #73573 | 73573 | $31.71 | 40.00 | $1,268.40 | | $133.89 | $0.00 |
| Euclid R50 End Dump #73574 | 73574 | $31.71 | 40.00 | $1,268.40 | | $133.00 | $0.00 |
| Euclid R50 End Dump #74795 | 74795 | $31.71 | 40.00 | $1,268.40 | | $133.89 | $0.00 |
| Euclid R50 End Dump #73759 | 73759 | $31.71 | 40.00 | $1,268.40 | | $133.89 | $0.00 |
| Komatsu D155AX-5 Dozer | D155AX-5 | $24.88 | 40.00 | $975.20 | | $122.46 | $0.00 |
| John Deere 450 Excavator | 91558 | $22.00 | 40.00 | $880.00 | | $99.80 | $0.00 |
| Hitachi ZAXIS 800 Excavator | FF017UQ966630 | $40.90 | 40.00 | $1,636.00 | | $166.60 | $0.00 |
| Komatsu D41PX-15 Dozer | B40500 | $17.80 | 40.00 | $716.00 | | $84.45 | $0.00 |
| Komatsu CK35-1 Skidsteer | A40017 | $2.53 | 40.00 | $101.20 | | $13.00 | $0.00 |
| Ingersoll-Rand SD100D Vibratory Roller | 187627 | $10.56 | 40.00 | $422.40 | | $36.18 | $0.00 |
| Batch Plant | 15524 | $56.16 | 40.00 | $2,246.40 | | $339.09 | $0.00 |
| 1999 Bobcat | 517611340 | $1.79 | 40.00 | $71.60 | | $235.88 | $0.00 |
| 2001 Bobcat Mini-Excavator | 514016441 | $2.88 | 40.00 | $115.20 | | $11.60 | $0.00 |
| GMC Fuel Truck | 1GDM7D1Y1VS16176 | $2.88 | 40.00 | $115.20 | | $29.12 | $0.00 |
| Manlift CH44C Manlift | 7729 | $5.00 | 40.00 | $227.20 | | $23.87 | $0.00 |
| Volvo EC460 Excavator #06630 | EC460V10644 | $21.00 | 40.00 | $840.40 | | $92.80 | $0.00 |
| Caterpillar D5K Dozer | YYY00175 | $7.00 | 40.00 | $280.00 | | $55.99 | $0.00 |
| John Deere 3AE Generator | 465X | $5.59 | 40.00 | $223.60 | | $90.50 | $0.00 |
| 3000 4" Pump #20 | 0670 | $1.60 | 40.00 | $64.00 | | $16.30 | $0.00 |
| 3000 4" Pump #21 | 0671 | $1.60 | 40.00 | $64.00 | | $16.30 | $0.00 |
| 3000 4" Pump #22 | 0672 | $1.60 | 40.00 | $64.00 | | $16.30 | $0.00 |
| 3000 4" Pump #23 | 0024 | $1.60 | 40.00 | $64.00 | | $16.30 | $0.00 |
| 16000 12/24" Pump #1 | 6355 | $2.88 | 40.00 | $115.20 | | $30.76 | $0.00 |
| 16000 12/24" Pump #8 | 8369 | $2.88 | 40.00 | $115.20 | | $30.76 | $0.00 |
| 16000 12/24" Pump #9 | 8254 | $2.88 | 40.00 | $115.20 | | $30.76 | $0.00 |
| 16000 12/24" Pump #10 | 8501 | $2.88 | 40.00 | $115.20 | | $30.76 | $0.00 |
| 16000 12/24" Pump #11 | 8365 | $2.88 | 40.00 | $115.20 | | $16.30 | $0.00 |
| 16000 12/24" Pump #12 | 9320 | $3.88 | 40.00 | $147.20 | | $43.00 | $0.00 |
| 16000 12/24" Pump #13 | 383 | $2.88 | 40.00 | $115.20 | | $30.76 | $0.00 |

Lodge00001828 — Page 2 of 5 — Filename: Copy of Total Weekly Costs Spreadsheet BLANK2.xlsx
JX083.004

*Lodge Construction, Inc. v. United States Trial Exhibit: JX083.004*

When presented with relevant documents at trial, Mr. Dunn credibly testified that he intended to enter the CHECKRATE operating rate for the batch plant in cell row 76 of Lodge's internal spreadsheet, but instead entered that rate in the cell row for the 1999 Bobcat. (Dunn, TR at 1040:2–16). In attempting to correct the error flagged by Mr. Rousseau's comments, Mr. Dunn neglected to ensure that the operating rate for the batch plant aligned with the CHECKRATE figure. (*Id.* at 1040:10–16). Thus, the Equipment Watch figure remained in Lodge's internal equipment cost spreadsheet that Lodge later utilized to prepare its Dewatering Claim. The Court concludes that Lodge's usage of the erroneous Equipment Watch rate was the product of a mistake.

### iii.  The batch plant operation time

As mentioned above, the batch plant was powered by a generator. (Rousseau, TR at 181:4–6). The generator featured a meter that measured operating hours. (*Id.* at 181:16–20). A laborer operated the batch plant from the control center. (*Id.* at 184:23–185:5; JX081). But unless the generator was running, the control room could not be operated, and the batch plant could not produce soil cement. (*Id.* at 181:7–14).

Lodge reported run-time for the batch plant in two different ways. For internal reporting purposes, Lodge referenced the hours metered by the generator to log the duration the batch plant operated. (*Id.* at 181:24–182:18). For internal reporting purposes, the hours the generator was running and the hours the batch plant was running "should have been the same." (*Id.* at 184:12–19). When reporting batch plant run-time to the Army Corps, however, Lodge used the amount of time the control center operator logged on his timesheet. (JX081; Rousseau, TR at 184:20–185:25).[17] Mr. Dunn was aware of this discrepancy because, in contemporaneous emails, Mr. Dunn specifically asked Mr. Rousseau to clarify his methodology. (JX081). Mr. Dunn asked whether the run-time Lodge would report for the batch plant should match the run-time Lodge internally reported for the generator. (*Id.*). Mr. Rousseau responded "No," and explained that he was reporting different values to the Army Corps based on whether Lodge employee Mike Wederath logged hours as a batch plant operator that day:



*Lodge Construction, Inc. v. United States Trial Exhibit: JX081*

---

[17] When confronted with his contemporaneous emails to Mr. Dunn in which Mr. Rousseau admitted a discrepancy in reporting operating time, Mr. Rousseau repeatedly testified that he was unable to remember what he was referring to in the emails. (*See, e.g.*, Rousseau, TR at 184:22, 185:4–5, 188:23–24). That testimony was not credible. During this period of testimony, Mr. Rousseau was evasive, unresponsive, and attempted to provide needlessly confusing responses to questions on which there could be no dispute as to the truthful answer given the clarity of the documents.

Attempting to clarify Lodge's method of reporting run-time, counsel for the United States presented Mr. Rousseau with several versions of a hypothetical in which Mr. Wederath would have logged hours at the batch plant but the generator would not be running. (Rousseau, TR at 186:1–189:13). Mr. Rousseau added further confusion regarding Lodge's methodology by stating that if Mr. Wederath were at the batch plant, Mr. Wederath would record his time as a batch plant operator, as opposed to a laborer, and would be compensated differently. (*Id.* at 186:4–13). Mr. Rousseau then testified that there were times Mr. Wederath would have been at the batch plant, but the batch plant was not operating. (*Id.* at 188:10–12). In that situation, according to Mr. Rousseau, Mr. Wederath would have been classified as a laborer. (*Id.* at 188:17–20). Curiously, Mr. Rousseau could remember all these machinations but was unable or unwilling to clarify his email that stated, "the batch plant's operating hours coincide with Mike's time at the plant[.]" (*See* JX081). On subsequent questioning from Lodge's counsel, Mr. Rousseau did not clarify his testimony. (Rousseau, TR at 199–208). And Lodge made no mention of this issue in its post-trial brief.

The claims documents undercut Mr. Rousseau's characterization of how Lodge was distributing Mr. Wederath's time between batch plant operation and general labor. The claims documents show that there is simply no way to look at Mr. Wederath's time sheet and derive an accurate measure of batch plant operating time. Each week of both the Dewatering Claim and the Design Claim, Lodge billed the Army Corps the operating and standby costs of the batch plant— 40 total hours each week. (*E.g.*, JX109.093, .097, .100, .104; *see also, e.g.*, JX104.146, .149, .152, .155). Likewise, each week without fail, Lodge billed the Army Corps for 40 hours of labor performed by Mr. Wederath. (*E.g.*, JX109.095, .099, .102, .106; *see also, e.g.*, JX104.148, .150, .153, .156). Each week, Mr. Wederath earned $1,000, or $25 per hour, regardless of how many hours the batch plant was operated. (*Compare, e.g.*, JX104.149, (zero operating hours, 40 standby hours), *and* JX104.150 *with* JX109.097 (28 operating hours, 12 standby hours) *and* JX109.099). Despite Mr. Rousseau's contention, Mr. Wederath's pay did not differ based on whether he was working as a batch plant operator or a laborer. (Rousseau, TR at 186:4–13 ("If [Mike Wederath] wasn't at the plant, it was my understanding that Lodge wouldn't pay him as a batch plant operator. So he might get paid as a laborer.")).

But even further examination of the claims documents reveals that Mr. Wederath's hours worked bore no relation at all to the operation of the batch plant. For the week ended July 20, 2011, Lodge billed 40 standby hours for the batch plant and zero operating hours. (JX109.100). Wederath worked 40 hours and earned $1,000. (JX109.102). For the week ended December 7, 2011, Lodge billed 42 operating hours for the batch plant and zero standby hours. (JX109.181). Mike Wederath worked 40 hours and still earned $1,000. (JX109.182). If Mr. Wederath's time at the batch plant and batch plant operation hours corresponded, as Lodge contended, one would expect that Mr. Wederath would earn less when the batch plant operated for fewer hours. But even assuming his rate of pay, whether classified as a batch plant operator or a laborer, was equal, when the batch plant operated for more than 40 hours during a week, one would expect Mr. Wederath's pay, and/or his hours worked, to increase for that week. Mr. Wederath's pay and hours worked remained constant, no matter how many hours Lodge recorded operating the batch plant. This example shows there was no correlation between hours Mr. Wederath recorded on his time sheet and batch plant operating hours.

Moreover, the weekly operating time Lodge reported for the batch plant's generator is inconsistent with the weekly operating time Lodge reported for the batch plant. (JX047 (purchase invoice for 405kW John Deere SAE generator); *see also* JX119.109 (Schaeb expert report associating the "John Deere SAE Generator" with the batch plant)). Lodge reported those operating times differently, despite Lodge's acknowledgment that without the generator running, the batch plant could not operate. (Rousseau, TR at 181:7–14, 184:12–19 ("Those numbers should have been the same.").

For fifteen of the weeks Lodge sought compensation in its Dewatering Claim, Lodge reported operating hours for the batch plant identical to those hours it reported for the generator. (JX109.100, .112–.113, .116–.117, .120–.121, .124–.125, .133, .144–.145, .149, .153, .160–.161, .165, .169, .173, .177, .185, .189, .193, .197, .201, .205 (fifteen weeks)). For nine of the weeks in the Dewatering Claim however, Lodge reported more operating hours for the batch plant than it did for the generator. (JX109.094, .097, .104, .108, .129, .137, .141, .157, .181 (nine weeks)). The difference in those hours is often substantial. (*E.g.*, JX109.093–.094 (8 generator hours, 20.65 batch plant hours), .097 (18 generator hours, 28 batch plant hours), .181 (26.25 generator hours, 42 batch plant hours)). The same is true of the Design Claim, though the batch plant sat idle for four weeks during that period. (JX104.146, .164, .167, .170 (four weeks where Lodge reported that the batch plant ran longer than the generator); JX104.149, .152, .155, .158 (zero hours for both the generator and batch plant)).

There are only two instances where Lodge reported running the generator more than it ran the batch plant. (JX109.129 (5 generator hours, 4 batch plant hours); JX104.161 (2.75 generator hours, zero batch plant hours)). Given running the generator was a prerequisite to running the batch plant, one might expect that the generator operating hours would occasionally outpace the batch plant operating hours. However, based on the testimony of Lodge employees and the expert from the United States, the inverse would be impossible. The Court finds that had Lodge properly recorded batch plant operating time based on generator operating time, Lodge would have reported far fewer operating hours for the batch plant in both its Dewatering and Design claims.

Mr. Rousseau's inability to provide a credible and coherent account of the events surrounding Lodge's method for reporting batch plant run-time leaves the Court with little reliable information on which to make a factual finding in Lodge's favor. The claims documents contradict Mr. Rousseau's testimony and indicate that there was no correlation between batch plant operation time and Mr. Wederath's work hours. The Court finds that Lodge utilized different metrics to report run-time for the batch plant: in submitting its Dewatering and Design claims, Lodge used Mr. Wederath's timesheet; but for its internal reporting purposes, Lodge used the metered hours from the generator. However, the Court is convinced by the evidence that generator hours were the only reasonable or reliable metric to calculate batch plant operating time. Consequently, Lodge's calculation of its equipment costs with respect to the batch plant was false because it relied on a wholly inappropriate metric for measuring run-time.

As a matter of common sense and experience in the contracting industry, Mr. Dunn was aware that using a time metric that did not correspond to the actual run-time of the batch plant would render Lodge's calculation of total batch plant operating costs misleading. (Dunn, TR at 817:22–818:25 (testifying to his experience in the business of construction)). Lodge knew the

hours for the batch plant run-time should have been determined using the meter on the generator. Mr. Dunn indicated that understanding by attempting to confirm that the operating hours Lodge reported internally for the batch plant were the same as those reported for the generator. (JX081 (Mr. Dunn asking Mr. Rousseau "The operating hours you give Debbie each week for the batch plant are the same as the generator. Correct?")). Once Mr. Rousseau responded in the negative, Mr. Dunn knew Lodge's claim incorporated operating hours that were based on an employee timesheet rather than the generator's meter. And Mr. Dunn reviewed the rate information in the Dewatering Claim concerning the costs of operating the batch plant. (Dunn, TR at 950:14–18). In setting forth those costs in Lodge's Dewatering and Design claims, Lodge fully intended that the Army Corps would pay based on that inappropriate time metric. (Dunn, TR at 950:19–23).[18]

### D. The Dewatering Pumps

The contract included a line item for "Dewatering" in a fixed price lump sum amount of $11 million. (JSOF ¶ 66; *see also* JX029.004). That line item, Contract Line Item Number ("CLIN") 0005, was divided into five pay items, three of which related to the construction of the cofferdam. (JSOF ¶ 67; *see also* JX028.008). Those three line-items—CLINs 5-000, 5-010, and 5-020—comprised $7,450,000 of the $11 million. (JSOF ¶ 67; *see also* JX028.008). The other two line-items—CLINs 5-100 and 5-110—totaled $3,550,000 and were related to dewatering activities. (JSOF ¶¶ 68–69). CLIN 5-100—totaling $910,000—related to dewatering the "borrow pits" from which material was extracted to create soil cement. (*Id.*). CLIN 5-110—totaling $2,640,000—related to dewatering the area inside the cofferdam to achieve dry conditions required for work on the levee. (*Id.*).

The Army Corps and Lodge agreed to divide payments for CLINs 5-100 and 5-110 into equal monthly installments. (*Id.* at ¶ 70). The Army Corps would pay Lodge fifteen monthly installments of $60,666.67 for CLIN 5-100 and fourteen monthly installments of $188,571 for CLIN 5-110. (*Id.*).[19] In calculating the financial impact for the inefficiency portion of its Dewatering Claim, Lodge applied its inefficiency ratio to a pool of costs—which included operating and standby costs for Lodge's dewatering pumps—from July 5, 2011 through January 14, 2012. (*Id.* at ¶ 71). Lodge's Design Claim included standby costs of $545,236 for its dewatering pumps for the period from March 29, 2012 through May 30, 2012. (JSOF ¶¶ 72–73). The fixed sum payments allocated risk to both parties—whether the pumps were used more or less than anticipated, the Army Corps would pay Lodge those fixed sums. (Gannon, TR at 88:16–89:9; Gore, TR at 539:10–24). In other words, if Lodge completed the project early, the Army Corps would still pay Lodge the full fixed price.

---

[18] Mr. Dunn testified that he could not remember the Design Claim. (Dunn, TR at 951:8–10). However, he also testified that he did not believe the Design Claim contained errors. (*Id.* at 897:24–898:17).

[19] Lodge and the Corps originally agreed to bill CLIN 5-110 in seventeen installments at $155,294.12. When Lodge finally began dewatering the cofferdam area, the Corps and Lodge revised the terms to compress the payments into fourteen months. The fixed total sum remained unchanged. (Gannon, TR at 95:12–18).

The fixed sum payments compensated Lodge for storage costs and pump costs, which included "fuel, maintenance and monitoring, and modif[ications] as needed" as well as any costs associated with moving the pumps or "adding and reducing as pumping efforts are warranted." (JX028.008). As of January 20, 2012—the date of Lodge's twelfth invoice to the Army Corps— Lodge had billed $1,508,571.43 to CLIN 5-110 for eight months of dewatering operations in the cofferdam area. (JX038.008, .031; Gore, TR at 544:3–545:19). That eight-month period encompassed the six months that comprised Lodge's Dewatering Claim, which ran from July 6, 2011 through January 14, 2012. (Schaeb, TR at 1175:8–15; JX109.209). Lodge's Dewatering Claim included equipment costs for running the dewatering pumps in the cofferdam area despite those costs having already been compensated by the Army Corps' monthly installment payments. (Schaeb, TR at 1173:21–1174:19). The costs of running the dewatering pumps in the cofferdam area were added to Lodge's cost pool which Lodge then multiplied by its inefficiency ratio as part of its Dewatering Claim. (*Id.*). Lodge added those costs despite the all-inclusive nature of CLIN 5-110, which Lodge understood would be compensated by fixed monthly payments regardless of how much dewatering progress Lodge made in that month. (Gore, TR at 539:21–24). Thus, Lodge's Dewatering Claim sought compensation for equipment costs related to dewatering the cofferdam to which it was not entitled because it had already been compensated through the fixed price arrangement.

Lodge offered some evidence that inclusion of dewatering operations in its Dewatering Claim cost pool related to its differing site condition claim. (Case No. 13-500, Lodge's Opp. to Mot. for Leave at 26; Dunn, TR at 1074:25–1075:10). For example, Lodge offered a "theory" that the weight of the water on the site, increased due to rainfall, pulled water up from the groundwater table due to displacement. (Gore, TR at 597:18–599:21). No expert testimony supported this vague assertion. Lodge takes a litigation position that its actual monthly costs exceeded the costs anticipated when it computed the lump sum amount for dewatering in its bid for the contract. (Case No. 13-500, Lodge's Opp. to Mot. for Leave at 26). Lodge maintains that the monthly installments did not contemplate additional costs that Lodge experienced as a result of unanticipated conditions and therefore, Lodge was entitled to bill for those unanticipated costs. (*Id.*). Even setting aside the all-inclusive nature of the fixed price arrangement, Lodge provided little evidence supporting its claim that, due to rain, the pumps had to work longer and harder than either party anticipated. (*See* Gore, TR at 597:18–598:11, 629:19–630:8 (testifying about the increased runtime of the dewatering pumps)). Lodge could not identify any documentation of increased effort expended by its dewatering pumps. (Dunn, TR at 974:10– 975:5). Furthermore, Lodge has no documentation of a baseline operating effort from which to measure any increased effort by the dewatering pumps. (*Id.*).

Perhaps more pertinently, Lodge's pumps were not utilized in direct relation to its differing site condition claim. Lodge used the pumps to move water from the levee area to the impoundment areas. (Gore, TR at 539:25–540:12). Lodge's differing site condition claim, which was not at issue in this trial, generally alleged that the water impoundment areas failed to percolate as expected. (Case No. 13-500, Lodge's Opp. to Mot. for Leave at 25). Therefore, as Lodge tells it, Lodge encountered more water on the site and had to undertake operations to move water out of the impoundment areas adding unanticipated costs. (Gore, TR at 540:13–15). But Lodge moved the water out of the impoundment areas to offsite locations—namely the Hillsboro Canal to the south—using gravity. (*Id.* at 540:20–542:3). Lodge did not use its dewatering pumps to move water out of the retention areas to offsite locations. (*Id.* at 541:16–

542:3; Dunn, TR at 848:1–849:9). In summary, Lodge's alleged differing site conditions would not implicate Lodge's dewatering pumps because the dewatering pumps moved water from the levy to the impoundment areas but were never used to move water from the impoundment areas to offsite locations. Therefore, any contention that Lodge was entitled to bill for dewatering pump operating costs in addition to the fixed installment payments is unsupportable.

Mr. Dunn knew that Lodge was being paid a fixed sum through monthly installments for dewatering operations. (Dunn, TR at 973:19–24). He understood that the fixed sum, though divided into monthly payments, was all-inclusive and imposed risk on both parties:

> **Lodge's Counsel:** Okay. Can you describe in simple terms the deal between you and the Corps of Engineers for the dewatering pumps? Was it a fixed-price deal?
>
> **Mr. Dunn:** It was just a lump-sum price.
>
> **Lodge's Counsel:** And you would get paid per month for, say, 1/14 of those costs if it was a 14-month job?
>
> **Mr. Dunn:** Yes.
>
> **Lodge's Counsel:** All right. And you did bill monthly and you got paid monthly; correct?
>
> **Mr. Dunn:** Yes.
>
> **Lodge's Counsel:** Well, and that was a fixed price. So if you did more dewatering, you'd have to eat that cost; right?
>
> **Mr. Dunn:** Correct.
>
> **Lodge's Counsel:** And if you did less, you'd be a winner?
>
> **Mr. Dunn:** Under normal conditions.
>
> **Lodge's Counsel:** Right.
>
> **Mr. Dunn:** And under the conditions that we anticipated when we bid the project.
>
> **Lodge's Counsel:** And so in your claim under the construction inefficiency ratio, you attempt to recover extra dewatering pump costs; right?
>
> **Mr. Dunn:** Absolutely. Yes.
>
> **Lodge's Counsel:** Okay. And those are above what you had billed for and received during the course of the project?
>
> [objection]

> **Lodge's Counsel:** Are those above?
>
> **Mr. Dunn:** Yes. Yes.

(Dunn, TR at 1073:10–1075:14). He also knew Lodge, in its Dewatering Claim, was seeking additional compensation for dewatering operations over and above the monthly installments. (*Id.* at 972:20–973:6). It was his intention, in submitting the Dewatering Claim, for the Army Corps to pay Lodge for dewatering operations over and above the monthly installment amount. (*Id.*). Mr. Gore reviewed each of Lodge's pay estimates, signed them, and submitted them to the Army Corps. (Gore, TR at 531:15–532:9). Therefore, he was aware that Lodge was being compensated for dewatering operations through fixed monthly installments. (*See, e.g.*, *id.* at 539:21–24).

Though Mr. Gore did not directly prepare Lodge's certified claims, he did assist that preparation through discussions with Paul Perkins and Cabot Dunn. (*Id.* at 518:2–25, 519:3–52:19). Curiously, Mr. Dunn "made a conscious decision" to exclude Mr. Gore from reviewing the final version of the Dewatering Claim. (*Id.* at 521:1–9). Mr. Dunn relied primarily on Mr. Gore's work in submitting its Dewatering Claim, but Mr. Dunn could not recall "[going] through the pay applications in detail to determine exactly what [Lodge was] billing for." (Dunn, TR at 973:7–18).

The Court finds that Lodge was aware of the fixed price for dewatering and knowingly and intentionally included dewatering pump operating costs in its certified Dewatering Claim that Lodge submitted to the Army Corps. Further, the Court finds that Lodge knew or should have known that those operating costs were not compensable under the contract's fixed price arrangement for dewatering operations.

## III.   Conclusions of Law

The United States brings two counterclaims in fraud against Lodge: (1) a False Claims Act claim under 31 U.S.C. § 3729 *et seq.*; and (2) a Special Plea in Fraud claim under 28 U.S.C. § 2514. (Case No. 13-500, Def.'s Am. Answer and Counterclaims, ECF No. 95; *see also* Case No. 13-499, Def.'s Am. Answer and Counterclaims, ECF No. 12). Each of these claims requires the United States to show not only presentation of a false claim, but also a level of knowledge and intent on the part of Lodge and its agents. "False" means untrue, deceitful, or erroneous. *False*, Black's Law Dictionary p. 718 (10th ed. 2014).

"Under the False Claims Act, '[a]ny person who . . . knowingly presents' to the government 'a false or fraudulent claim for payment or approval' 'is liable to the United States Government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains.'" *Daewoo Eng'g & Const. Co. v. United States*, 557 F.3d 1332, 1340 (Fed. Cir. 2009) (quoting 31 U.S.C. § 3729(a)). A "claim" includes any request or demand for money presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2). Although a "claim" is a term of art under the False Claims Act, for context, a "false claim" is commonly understood as an "assertion or statement that is untrue," especially "overbilling." *False Claim*, Black's Law Dictionary p. 719 (10th ed. 2014). False Claims Act liability applies not only to formal claims submitted to the government for payment but also to submission of "false record[s] or statement[s] material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(B). A

statement is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(4). The False Claims Act contains a civil penalty that may be imposed if the trial court finds fraud, regardless of whether the government sustained any actual damages. § 3729(a). The United States seeks imposition of that penalty here. (Case No. 13-500, Def.'s Am. Answer and Counterclaims at 28).

Whether a contractor "knowingly" presents a false claim or makes a false statement or record is broadly defined. The False Claims Act requires a showing of actual knowledge, deliberate ignorance, or reckless disregard for the truth of a false or fraudulent claim. 31 U.S.C. § 3729. "[R]eckless disregard in this context is not a 'lesser form of intent,' but an extreme version of ordinary negligence." *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (internal quotations omitted). A False Claims Act "violation may be established without reference to the subjective intent of the defendant." *Id.* (finding that "[i]n failing 'utterly' to review the false submissions, [the defendant] acted with reckless disregard."). "[T]he False Claims Act covers not just those who set out to defraud the government, but also those who ignore obvious deficiencies in a claim." *Horn & Assocs., Inc. v. United States*, 123 Fed. Cl. 728, 763 (2015) (explaining that Congress intended the False Claims Act to encompass "the problem of the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know.").

The Court of Federal Claims has applied the "reckless disregard" standard to encompass false claims submitted and attributable to complicated cost accounting schemes and less-than-precise recordkeeping. *UMC Elecs. Co. v. United States*, 43 Fed. Cl. 776, 793 (1999), *aff'd*, 249 F.3d 1337 (Fed. Cir. 2001) ("It is apparent that this reckless disregard standard prevents defendants from simply pointing to confusion over invoices and billing records as a complete defense."). As Judge Horn explained in *UMC Elecs.*:

> [A]t a minimum, every party filing a claim before the contracting officer and this court has a duty to examine its records to determine what amounts the government already has paid or whether payments are actually owed to subcontractors or vendors. The case law stands for the proposition that a *failure to make a minimal examination of records constitutes deliberate ignorance or reckless disregard*, and a contractor that deliberately ignored false information submitted as part of a claim is liable under the False Claims Act. To find otherwise would allow parties filing an action in this court to "double-bill" the government and then hide behind a posture of feigned ignorance.

*Id.* at 794 (internal citation omitted) (emphasis added). "The government must establish a violation of the FCA by a preponderance of the evidence." *Veridyne Corp. v. United States*, 758 F.3d 1371, 1378 (Fed. Cir. 2014).

The Special Plea in Fraud counterclaim is a forfeiture claim and affirmative defense to liability. The relevant part of the code, titled "Forfeiture of fraudulent claims," reads:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against

the United States in the proof, statement, establishment, or allowance thereof. In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514. In pursuing a Special Plea in Fraud claim, "the government bears the burden of proving that the claimant (1) knew the claim was false and (2) intended to deceive the government by submitting it." *Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1042 (Fed. Cir. 1994). The forfeiture penalty is mandatory, and must be imposed as to the entire claim if the trial court finds a fraudulent act or attempt:

> There is no suggestion in the statute that a contract can be divided up into performance sectors to allow payment of some claims on a corrupted contract while other claims on the same contract are forfeited. The effects of a fraudulent act, therefore, have an impact on every aspect of contract performance and the entirety of the claim, making it impossible to distinguish between tainted and untainted claims, for which reason the contractor may not recover on any claims under the contract.

*UMC Elecs.*, 43 Fed. Cl. at 790–91 (collecting cases).

The Special Plea in Fraud counterclaim demands the claimant carry a heavier burden of proof than the False Claims Act. To prevail under 28 U.S.C § 2514, the United States must establish, by *clear and convincing evidence*, that the contractor submitted claims with knowledge of their falsity and with an intent to defraud the United States government. *Veridyne Corp.*, 758 F.3d at 1376–77. In order to reach that burden, the claimant must "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions [is] 'highly probable.'" *State of Florida v. State of Georgia*, 141 S. Ct. 1175, 1180 (2021) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

Importantly, with respect to both claims, mere mistakes do not rise to the level of fraud. *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (summarizing innocent mistake cases). Exploration of legal gray areas is also not fraud. *UMC Elecs. Co.*, 43 Fed. Cl. at 794 ("A contractor, upon submission of a claim, who is aware of and takes advantage of a disputed legal issue does not knowingly commit fraud."). Inconsistencies, if they can be reasonably explained, also do not constitute fraud. *Larry D. Barnes, Inc. v. United States*, 45 F. App'x 907 (Fed. Cir. 2002) ("Inconsistencies, even if the discrepancy is large, do not rise to the level of fraud if there is a *reasonable* explanation for them.") (emphasis added).

### A. Lodge's Dewatering Claim was fraudulent with respect to the costing of the Euclid Trucks.

In submitting its Dewatering and Design claims to the Army Corps, Lodge used operating and standby rates for a 2006 773D Caterpillar Truck, a piece of equipment specifically listed in the USACE Manual. (Dunn, TR at 921:5–16, 927:12–17). In doing so, Lodge represented to the Army Corps that the equipment Lodge used on the project was either identical to that piece of equipment listed in the USACE Manual or "equivalent" in terms of size, capacity, horsepower, and value. (JX001.337–.338; Schaeb, TR at 1163:4–1165:21). That representation was false.

*Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989 (2016) (False Claims Act "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement."); *see also Crane Helicopter Ser., Inc. v. United States*, 45 Fed. Cl. 410, 413–414 (1999) (discussing whether misrepresentation of equipment used during contract performance renders a claim "false") *abrogated on other grounds by Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348 (Fed. Cir. 2013). Lodge used older Euclid R50 trucks, not the Caterpillar 773D trucks listed in the USACE Manual. Lodge's Euclids were worth, at most, between $14,000 and $24,000 each—far less than a 2006 773D Caterpillar truck, which the USACE Manual valued at $888,686 per truck. (JX072.5–072.8; JX001.252). Although Lodge argues its trucks were rebuilt, Lodge offered no evidence to support the value of any capital improvements. (Dunn, TR at 913:17–917:14).

Lodge submitted these false claims to the Army Corps with the knowledge that they were false. Lodge knew that its Euclids were not accurately valued at $888,686 each—it possessed information about the purchase price and considered that value in seeking a sale after any capital improvements. (*Id*. at 904:22–906:8, 925:12–928:9; DX397). That value—$40,000 for all four Euclids—varies greatly from the $3,554,744 collective value had the trucks been the same make and model as the ones Lodge reported using. Mr. Perkins advised Mr. Dunn that Lodge would need to adjust the rates of its trucks because the USACE Manual rate for the 773D Caterpillar would be inappropriate. (JX068; Perkins, TR at 712:6–713:1, 717:5–719:3). Lodge proceeded to submit its Dewatering and Design claims using the false rate anyway. (Dunn, TR at 1066:7–1067:20). The United States submits that, after Lodge applied its inefficiency ratio and amended its Complaint to assert additional Design Claim damages, Lodge sought a total of $128,562 for the Euclids after applying credits for repair time. (USA Trial Brief at 15).

Lodge's arguments that mispricing its Euclids was not fraudulent are unpersuasive. First, Lodge argues that Equipment Watch is a reputable equipment costing database and therefore, Lodge's use of that database was not a misrepresentation. (Lodge Trial Brief at 20–21). Given Lodge's knowledge that it was required to comply with the USACE Manual rates, the reputation of Equipment Watch is irrelevant. Even if it were permissible, Lodge only used that database to analogize an erroneous rate from the USACE Manual. Lodge did not use the Equipment Watch rate in its claims or otherwise explain to the Army Corps why it believed that rate should be considered analogous to the 773D Caterpillar rate. The USACE Manual contains clear instructions, which Lodge understood, regarding costing equipment not listed in Table 2-1. Lodge wholly ignored those instructions.

Second, Lodge makes much of the fact that it "reduced" the operating rates for Euclids when it carried them from its job costing ledger to the Dewatering and Design claims. (*See, e.g.*, Lodge Trial Brief at 22–23). But Lodge only reduced its operating rates so they would align with the USACE Manual rates, rather than appear to be obviously independently derived. It is not far-fetched to believe that Lodge might have reduced the Euclid operating rates in an attempted effort to avoid detection. *See Sonnentheil v. Moerlein Brewing Co.*, 172 U.S. 401, 410 (1899) ("Parties contemplating a fraud frequently pursue such devious courses to conceal their designs, and resort to such subtle practices to mislead . . .."); *cf. In re Gen. Motors LLC*, 257 F. Supp. 3d 372, 442 (S.D.N.Y. 2017) ("fraudulent concealment is characterized by deceptive acts or

33

contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter.") (internal quotations omitted).

Regardless of why or whether Lodge reduced the operating rates for its Euclids, Lodge's argument misses the same point made previously; Lodge knew that by selecting the USACE Manual to report its rates, it was required to use the USACE Manual methodology in costing its equipment. It failed to do so. Neither the USACE Manual nor FAR § 31.105 allows the contractor to mix and match equipment rate schedules to report ownership and operating costs. Because Lodge did not use the methodology required by the USACE Manual, any reductions to an erroneous rate are also irrelevant.

In summary, the United States has established—by clear and convincing evidence—that Lodge's Dewatering and Design claims were false with respect to the operating and standby costs of its Euclid R50 dump trucks. The United States has also established—by clear and convincing evidence—that Lodge knew its Dewatering and Design claims contained materially false records and statements when it certified and submitted its claims to the Army Corps. Consequently, the Court finds that, under both 31 U.S.C. § 3729 and 28 U.S.C. § 2514, Lodge's Dewatering and Design claims were fraudulent with respect to the costs of its Euclid trucks.

   B. *Lodge knew or should have known that its Inefficiency Ratio would produce a fraudulent claim.*

Lodge's method for calculating its inefficiency ratio was flawed in at least two ways. First and foremost, it was not a reasonable, accurate, or truthful measure of inefficiency. Second, even if it were a true measure of inefficiency in concept, the inefficiency ratio captures days that are not properly part of the Dewatering Claim at all. Standing alone, each flaw renders Lodge's claim false. The combination of the two flaws belies that Lodge simply made a mistake in calculating its Dewatering Claim. Lodge knew or should have known that the inefficiency ratio would produce a fraudulent claim.

With respect to the denominator, contract modification P00009 should have been incorporated to some extent—a fact Lodge has acknowledged. However, though its exclusion may have caused Lodge's affirmative claims to fail on their merits, that issue was not before the Court in this trial. Lodge's failure to account for modification P00009 was not, on its own, fraudulent because it turns on a legitimately disputed legal question. *See UMC Elecs. Co.*, 43 Fed. Cl. at 794.

Lodge's inefficiency ratio was inaccurate, and thus the value of the Dewatering Claim was inaccurate. The inaccuracies are attributable to the true number of actual days in the numerator of the ratio. Lodge's methodology for tallying actual days spent working on Section 1 demonstrates a failure to make a minimum examination of records and thus, constitutes a reckless disregard for the accuracy of the Dewatering Claim. The United States demonstrated Lodge's reckless disregard for the accuracy of its Dewatering Claim by clear and convincing evidence. The United States has also shown that, more likely than not, Lodge intentionally used the inefficiency ratio to fraudulently inflate its Dewatering Claim. Consequently, the Court finds that Lodge's inefficiency ratio was fraudulent under both 31 U.S.C. § 3729 and 28 U.S.C. § 2514.

i. Lodge knew or should have known that its "inefficiency ratio" was not a reasonable, accurate, or truthful measure of inefficiency.

Lodge used a rudimentary "tick mark" methodology to tally actual days in its attempt to demonstrate that the work Lodge performed in Section 1 overran the days it allocated for that work. However, as Ms. Callaway acknowledged, that methodology was so fundamentally flawed that it does not reasonably, accurately, or truthfully characterize inefficiencies. By incorporating that tally into the inefficiency ratio and applying the ratio to a cost pool, Lodge grossly overstated the value of its Dewatering Claim. That overstatement renders Lodge's Dewatering Claim false. *Brunswick Bank Trust Co. v. United States*, 707 F.2d 1355, 1365 (Fed. Cir. 1983) (misrepresentations render a claim false to the "extent of the exaggeration.").

Ms. Callaway's utilization of that tick mark method shows a reckless disregard for the accuracy of Lodge's certified claim. In her review of the daily logs, Ms. Callaway did not determine whether the inefficiency ratio would measure effort expended or resources used. Despite her training in scheduling, significant education, and experience in the construction industry, Ms. Callaway made no effort to consider whether a tick mark was an appropriate measure of a single activity day. She failed to consider whether each incremental increase in the number of activity days would reasonably correspond to an increase in her ratio. Finally, despite knowing that increasing the ratio would increase the total damages claimed, Ms. Callaway made no effort to reconcile the dollar value of each activity day she included in her ratio with the actual resources Lodge might expend in a legitimate activity day.

The United States' expert, Eric Schaeb, demonstrated that Lodge's ratio valued each activity day at approximately $6,500 per day. (Schaeb, TR at 1159:11–13). Applying that value to several days where work was minimal, the United States credibly demonstrated that Lodge often billed the Army Corps at rates of $2,000, $2,167, $4,333, $10,800, and even $21,677 *per hour* for work frequently performed by only a single laborer or piece of equipment. (USA Trial Brief at 24–25). The Court concludes that Lodge's failure to examine the effort or resources expended and consider whether the tick mark methodology reasonably, accurately, and truthfully measured daily inefficiencies clearly and convincingly shows Lodge exhibited a reckless disregard for the accuracy of its Dewatering Claim.

But Lodge's conduct likely goes beyond mere reckless disregard for the accuracy of its claim. The Court additionally concludes that, more likely than not, Lodge intentionally used its inefficiency ratio as a tool to inflate the damages calculation of the claim it presented to the Army Corps. "The court may . . . consider circumstantial evidence in making its determination." *Alcatec, LLC v. United States*, 100 Fed. Cl. 502, 517 (2011), *aff'd*, 471 F. App'x 899 (Fed. Cir. 2012) (citing *Kamen Soap Prods. Co. v. United States*, 129 Ct. Cl. 619, 642 (1954) ("About the only way a just conclusion can be reached is by placing the questioned documents and statements alongside well-known and established facts.")). As stated above, at the time she prepared the inefficiency ratio, Ms. Callaway understood the relationship between increasing the ratio and increasing the amount of damages Lodge would be seeking in its Dewatering Claim. Mr. Perkins reviewed the Dewatering Claim; he recommended against using the ratio or tailoring it to the effort expended and equipment used. Mr. Perkins saw this issue as "the big one," warning Mr. Dunn that the Army Corps would "immediately object to this method of calculating impacts." (JX075; Dunn, TR at 1043:12–22). Though Lodge reduced the inefficiency ratio "to be

conservative" based on Mr. Perkins's warnings, Lodge still utilized the ratio in its Dewatering Claim despite knowing the revisions would not abate Mr. Perkins's concerns. (Dunn, TR at 1044:15–24). Furthermore, reducing the amount of a false claim to make it more plausible does not negate an act of fraud. In fact, if anything, it indicates that Lodge attempted to conceal its fraudulent acts by reducing its inflated claims to a degree that might evade detection. *See Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1103 (7th Cir. 1992) ("Of course people who commit frauds often try to conceal them, as distinct from merely hoping that no one will notice so long as they don't advertise the fraud.") (Posner, J. concurring).

Lodge certified and submitted its Dewatering Claim seeking $3,282,123.02. (JSOF ¶¶ 18, 20). Lodge asserted that the cost impact of the inefficiencies was $2,073,699.42. (JX109.092). Lodge arrived at that figure by multiplying its costs of "anticipated production" ($1,402,759.53) by its 247.83% inefficiency ratio to arrive at its "actual cost" of production ($3,476,458.95). (*Id.*). Lodge then added the costs of labor and equipment to install culverts and applied "credit for equipment down time due to repairs" to arrive at a total inefficiency-adjusted cost of $1,983,387.17. (*Id.*). Lodge added this sum to the claims it intended to pass through from its subcontractor—$1,084,017.52—and applied a 7% profit markup to arrive at the total costs of its Dewatering Claim, adjusted for its alleged inefficiencies. (*Id.*). Though the United States has not sought to recover any actual damages, the Court includes these figures to contextualize the amount of the fraud.

The Court concludes that the persuasive circumstantial evidence demonstrates Lodge knew, even after revisions, that its inefficiency ratio was not an accurate measure of inefficiencies. Lodge based its Dewatering Claim on that ratio anyway. The United States has demonstrated, by clear and convincing evidence, that Lodge presented its Dewatering Claim— with reckless disregard for its falsity—to the Army Corps seeking payment. The Court additionally concludes it is more likely than not that, in utilizing the inefficiency ratio, Lodge's intention was to fraudulently inflate its Dewatering Claim. Therefore, the United States has demonstrated that under both 31 U.S.C. § 3729 and 28 U.S.C. § 2514, Lodge's Dewatering Claim was fraudulent.

### ii. Lodge's "inefficiency ratio" fraudulently counts days outside the claim period.

Even if the ratio were a conceptually reasonable measure of inefficiencies, which it is not, Lodge's erroneous inclusion of days outside of the claim period was an intentional misrepresentation that rendered the Dewatering Claim fraudulent. Lodge's Dewatering Claim purported to capture the effects of inefficiencies due to dewatering difficulties from July 6, 2011 to January 14, 2012. (JX109.209 ("The impacts covered as a part of this Contract Disputes Act ('CDA') claim occurred from July 6, 2011 through January 14, 2012[.]")). However, in calculating the number of activity days for the numerator of her ratio, Ms. Callaway included activity days that correspond to work performed *after* January 14, 2012. Lodge's inclusion of those 55 days inflated its inefficiency ratio from 200% to 247%. (Schaeb, TR at 1159:1–10). Inflation of the ratio increased Lodge's Dewatering Claim by $358,953, rendering Lodge's Dewatering Claim clearly and convincingly false.

Lodge's inclusion of days outside of that period clearly and convincingly shows, at the least, a failure to make a minimum examination of records in reckless disregard as to the

36

accuracy of its certified claim. But the evidence also clearly and convincingly supports a finding that Lodge intentionally included the 55 days to fraudulently inflate its ratio and, by that fact, its Dewatering Claim. As the Court noted previously, Ms. Callaway testified inconsistently regarding whether inclusion of those days was proper or intentional. The Court has also noted its concerns as to Ms. Callaway's credibility. The Court accepted as a judicial admission that Ms. Callaway previously testified that "no days after January 14, 2012 should be counted in the calculations of the actual duration delays[.]" (Opinion on Mot. in Lim., ECF No. 72). But Mr. Dunn adamantly affirmed at trial that the inclusion of those 55 days after January 14, 2012 was intentional, not a mistake in preparing the claim:

> **The United States:** Okay. Now, Lodge, in fact, used days after January 14th, 2012, in its dewatering claim; correct?
>
> **Mr. Dunn:** I am familiar with the 55-day issue, yes.
>
> **The United States:** And Lodge knew that including days after January 14th would make the inefficiency ratio indicate higher inefficiency; correct?
>
> **Mr. Dunn:** Based upon the way the ratio works, that -- yeah, actual days would increase the inefficiency ratio.
>
> **The United States:** And a higher inefficiency ratio meant there would be a higher cost claim against the government; correct?
>
> **Mr. Dunn:** The higher the inefficiency ratio, the higher the cost claim, yes, that's correct.
>
> **The United States:** Okay. There's no mistake of mere carelessness with respect to Lodge's claims after January 14th, 2012; correct?
>
> **Mr. Dunn:** I didn't understand the question. "Carelessness"?
>
> **The United States:** This is not a mistake. Including the days after January 14th, 2012, was not mere carelessness with respect to Lodge's claims; correct?
>
> **Mr. Dunn:** I don't think this claim is careless.
>
> **The United States:** Right. Lodge knew what it was doing. And it intended to obtain money from the United States in connection with the days after January 14th, 2012; correct?
>
> **Mr. Dunn:** We intended to be paid for our -- the delays that we were suffering based upon this.
>
> **The United States:** Can you answer the question that I asked you? Lodge knew what it was doing. And it intended to obtain money from the United States in connection with the days after January 14th, 2012; isn't that correct?

**Mr. Dunn:** If -- yes, if they were included in the actual, we were.

(Dunn, TR at 947:8–948:18).

In arguing that its Dewatering Claim was not fraudulent, Lodge contends that (1) it retained Mr. Perkins to assist with claim preparation; (2) it ultimately reduced its claims with credits and set-offs; and (3) any falsities are essentially a wash given the mistakes Lodge made in the Army Corps' favor. (Lodge Trial Brief at 39–46). None of these arguments are relevant to the two basic issues the Court is required to decide in a fraud case—whether the claim submitted was false and whether the contractor knew it was false when submitted. Simply because Lodge *might* demonstrate calculations that *might* hypothetically accrue to the benefit of the United States, none of which have been convincingly established, does not mean Lodge is relieved of its burden of truthfulness in presenting its claims. The Court finds Lodge's arguments unpersuasive and undeserving of extensive discussion.

With Mr. Dunn's assertions, the United States has clearly and convincingly demonstrated that Lodge intentionally included 55 days after January 14 in its inefficiency ratio, despite representing to the Army Corps that its Dewatering Claim contained costs from July 6, 2011 through January 14, 2012. Lodge knew the effect that increasing the inefficiency ratio would have on the damages asserted in the Dewatering Claim. Therefore, the Court concludes—by clear and convincing evidence—that Lodge fraudulently exaggerated its Dewatering Claim in violation of both 31 U.S.C. § 3729 and 28 U.S.C. § 2514.

The United States submits that removing the 55 days Lodge fraudulently included in its inefficiency ratio would reduce the inefficiency factor from 247.83% to 200%. (USA Trial Brief at 23; Schaeb, TR at 1159:1–10). In isolation, this adjustment reduces Lodge's Dewatering Claim by $358,953. (Schaeb, TR at 1159:1–10). Though the United States has not sought to recover actual damages, the Court includes these calculations to contextualize the amount of the fraud.

      iii.   <u>Lodge's failure to incorporate the impacts of contract modification P00009 was not fraudulent.</u>

Contract modification P00009 consolidated two CLINs into CLIN 0007. As part of the modification, the Army Corps authorized Lodge to bill an additional $1,990,000 and granted additional days to complete excavation. In calculating its inefficiency ratio and submitting its Dewatering Claim to the Army Corps, Lodge did not incorporate those additional days.

Though the United States asserts that Lodge's failure in this regard was fraudulent, the Court disagrees. Lodge never submitted pay applications against the increased authorization. Lodge did not complete excavation of the original amount of material allocated in CLIN 0007. But most importantly, Lodge's Dewatering Claim explicitly stated that, in calculating its inefficiency ratio, Lodge was utilizing the original baseline schedule which did not account for contract modification P00009. Putting aside the issues addressed above—i.e., whether the inefficiency ratio was a reasonable and accurate measurement of inefficiencies—the denominator of the ratio was not a misrepresentation and thus cannot form the basis of a false claim. But even if Lodge did misrepresent the schedule it used, Lodge's explanation that it did not perform

excavation work pursuant to P00009 is a reasonable one. To be clear, the Court does not opine that Lodge's interpretation of the impact of P00009 is the correct one, merely a reasonable one that may be flawed in practice. Errors based on flawed reasoning are not fraudulent. *U.S. ex rel. Lamers*, 168 F.3d at 1018 ("errors based simply on faulty calculations or flawed reasoning are not false under the [False Claims Act].") (citing *Wang v. FMC Corp.*, 975 F.2d 1412, 1420–21 (9th Cir. 1992)).

Unlike the numerator of the inefficiency ratio, Lodge offered a sensible explanation of its reasoning that it did not take advantage of contract modification P00009. That explanation is supported in part by the fact that Lodge did not seek any additional compensation that P00009 authorized it to seek for increased excavation. Though, as Ms. Callaway noted, Lodge probably should have accounted for the extra days P00009 allowed Lodge to bill for equipment costs, the Court recognizes that that impact may not have been immediately obvious to Lodge at the time it submitted its claim. This is, again, in contrast to the numerator of the ratio which was so fundamentally flawed as to obviously distort the cost impact of any alleged inefficiencies. Thus, the Court concludes that Lodge's failure to account for contract modification P00009 was not fraudulent under either 31 U.S.C. § 3729 or 28 U.S.C. § 2514.

### C. Lodge's batch plant costs were fraudulent in some respects.

The United States asserts that Lodge's Dewatering Claim fraudulently included the costs of operating its batch plant in three ways. (USA Trial Brief at 39–42). First, the United States argues that to the extent Lodge sought operating costs that included costs of ownership, Lodge's Dewatering Claim was knowingly false. Second, the United States asserts that Lodge used an operating rate from Equipment Watch rather than the rate required by the USACE Manual, rendering the Dewatering Claim false. Third, the United States alleges that Lodge improperly calculated batch plant operation hours, falsely inflating the time of operation.

The Court concludes that Lodge fraudulently inflated batch plant run-time. However, ownership of the batch plant turns on a disputed legal question and Lodge's operating rate was the product of a mistake. Therefore, those issues do not rise to the level of fraud.

i. <u>The United States has not met its burden to show that batch plant ownership costs were fraudulent.</u>

As previously discussed, in an unusual arrangement, the Army Corps paid Lodge up front for the entire cost to purchase, deliver, and install the batch plant. Lodge then financed roughly 75% of the purchase costs through SunTrust Bank. Despite receiving credits from the batch plant vendor and failing to pay the principal of the loan from SunTrust, Lodge's Dewatering Claim sought to claim ownership costs. The United States asserts that Lodge was not entitled to claim ownership costs related to the batch plant, yet Lodge included operating and standby costs that featured adjustments for ownership costs. (USA Trial Brief at 40).

Part 31 of the FAR contains guidance as to whether contractors are permitted to take depreciation on owned assets. Specifically, FAR § 31.205-11 provides that depreciation, rental, and use charges "are unallowable on property acquired from the Government at no cost by the contractor . . .." Lodge argues that it did not acquire the batch plant from the Government, it

acquired the batch plant from Loadcraft Industries, Inc., and the Government simply provided an advance. (Lodge Trial Brief at 34). Indeed, Lodge financed the purchase of the batch plant through SunTrust Bank, incurring interest as a cost of capital. Contractors may seek to recoup costs of capital under FAR § 31.205-10.

Whether Lodge "acquired" the batch plant from Loadcraft Industries or the Army Corps is a mixed question of fact and law. As mentioned above, a contractor does not commit fraud when it is "aware of and takes advantage of a disputed legal issue[.]" *UMC Elecs. Co.*, 43 Fed. Cl. at 794. The Court declines to resolve the legal question of batch plant ownership at this stage; that question would be more appropriate in the context of assessing the Army Corps' liability to Lodge. In any event, because ownership is a disputed legal question in this case, the United States cannot meet its burden to demonstrate fraud under either 31 U.S.C. § 3729 or 28 U.S.C. § 2514.

### ii.   Lodge mistakenly reported its batch plant operating rate.

In submitting its Dewatering Claim, Lodge utilized an operating rate of $339.09 per hour. It derived that rate from Equipment Watch. However, Lodge's use of that rate rather than the USACE Manual rate of $235.88 appears to have been an error due to Mr. Dunn mis-keying an internal spreadsheet. As described previously, Mr. Dunn updated the spreadsheet, attempting to replace the Equipment Watch rate with the USACE Manual rate. However, the evidence suggests he updated the wrong cell pertaining to a different piece of equipment. In correcting that error, Mr. Dunn failed to notice that the Equipment Watch rate remained in the batch plant cell.

The Court concludes that Lodge's use of the Equipment Watch rate rather than the USACE Manual rate is a mistake and cannot be considered fraud under either 31 U.S.C. § 3729 or 28 U.S.C. § 2514. *See U.S. ex rel. Lamers*, 168 F.3d at 1018; *cf. Argus Chemical Corp. v. Fibre Glass-Evercoat*, 812 F.2d 1381, 1385 (Fed. Cir. 1987) (holding that, in patent fraud cases, "inadvertent errors or honest mistakes which are caused by neither fraudulent intent or design . . . do not constitute fraud . . ..") (quoting *Cataphote Corp. v. DeSoto Chem. Coatings, Inc.*, 450 F.2d 769, 772 (9th Cir. 1971)).

### iii.   Lodge fraudulently inflated batch plant operating run-time.

To total its equipment costs related to the batch plant, Lodge multiplied the operating rate by the run-time. However, Lodge's measurement of run-time was based on a particular employee's hours worked, not the hours metered by the batch plant generator. The generator was the only reasonable or accurate measurement of batch plant run-time given that the generator must have been running for the batch plant to operate. Lodge misstated the operation costs of the batch plant by using an employee timesheet instead of the generator's metered hours. Therefore, the operating costs of running the batch plant as included in Lodge's Dewatering and Design claims are false.[20]

---

[20] Even after the cofferdam failed, Lodge recorded batch plant operating time in its Design Claim. (*See, e.g.*, JX109.146, .164, .167, .170).

Mr. Rousseau's email to Mr. Dunn shows that Lodge, under the direction of Mr. Dunn, knew that it was reporting a rate based on employee timesheets rather than metered hours. (JX081). Lodge's use of the generator's metered hours demonstrates that Lodge knew and understood metered hours to be the appropriate metric for measuring batch plant run-time. Nevertheless, Lodge intended to submit the Dewatering and Design claims while knowingly using an inappropriate and inaccurate run-time metric. In conclusion, Lodge's Dewatering and Design claims were knowingly false with respect to the equipment costs of the batch plant.

Although the Court concludes that the batch plant run-time was knowingly false when submitted, the evidence of Lodge's fraudulent intent is circumstantial. "The court may . . . consider circumstantial evidence in making its determination." *Alcatec, LLC*, 100 Fed. Cl. at 517 (2011), *aff'd*, 471 F. App'x 899. But because of the gaps in the evidence, the Court is unable to find that the evidence clearly and convincingly supports that conclusion. Nevertheless, a preponderance of the evidence supports the Court's conclusion that under the False Claims Act, 31 U.S.C. § 3729, Lodge's batch plant operating costs were fraudulently submitted to the Army Corps.

### D.  The Dewatering Pumps

Lodge included the operating and standby costs for its dewatering pumps—between June 5, 2011 and January 14, 2012—in the cost pool to calculate its certified Dewatering Claim. (Schaeb, TR at 1173:21–1174:19). Effectively, Lodge represented to the Army Corps it was entitled to recover the cost of the dewatering pumps in this six-month period. (JX038.008, .031; Gore, TR at 544:3–545:19). However, Lodge had already been paid a lump sum for dewatering activities that allocated risk to both parties. Consequently, Lodge's representation had no colorable or plausible basis and was therefore false. *Daewoo Eng'g & Const. Co.*, 557 F.3d at 1339–40.

Lodge submitted this claim to the Army Corps with the knowledge that it was false. First, Lodge knew the contract's line items for dewatering activities—CLINs 5-100 and 5-110—were fixed price lump-sums paid in equal monthly installments. (JSOF ¶ 70). In fixed price contracts, contractors assume the risk of unexpected costs. *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1347 (Fed. Cir. 2014). Here, Lodge knowingly assumed that risk when entering the contract. (Case No. 13-500, Lodge's Opp. To Mot. for Leave at 26; Gannon, TR at 88:16–89:9; Gore, TR at 539:10–24). Further, Mr. Dunn admitted he knew the "lump-sum price" for the dewatering pumps was all-inclusive. (Dunn, TR at 972:20–973:6). As a result, Lodge was responsible for any costs exceeding the fixed price lump sum. (Gannon, TR at 88:16–89:9; Gore, TR at 539:10–24). The United States proved by clear and convincing evidence that Lodge was aware of the fixed price for costs associated with dewatering pumps.

Second, Lodge knowingly and intentionally included fraudulent dewatering pump operating costs in its Dewatering Claim when it certified and submitted that claim to the Army Corps. Lodge knew it already billed the Army Corps for the eight-month period containing June 5, 2011 through January 14, 2012. (*See, e.g.*, Gore, TR at 539:21–24). Each of Lodge's pay estimates was reviewed by Mr. Gore before submission to the Army Corps. (*Id.* at 531:15–532:9). Mr. Dunn reviewed Mr. Gore's work when preparing and submitting Lodge's Dewatering Claim. (Dunn, TR at 973:7–18). Therefore, Lodge knew that including the

dewatering pump costs would, in effect, "double-bill" the Army Corps. *UMC Elecs. Co*, 43 Fed. Cl. at 794 (holding that a contractor cannot escape fraud claims by feigning ignorance that would permit double-billing). Notably, Mr. Dunn admitted that Lodge intended to recover costs that exceeded the fixed payments for CLIN 5-100 and CLIN 5-110 when it included the dewatering pump costs in its Dewatering Claim. (Dunn, TR at 972:20–973:6). Therefore, the Court is persuaded by clear and convincing evidence that Lodge knowingly and intentionally included fraudulent costs in the Dewatering Claim. *Veridyne Corp.*, 758 F.3d at 1376–77.

Even if Lodge did not have actual knowledge that including the operation costs for the dewatering pumps was fraudulent, Lodge acted in reckless disregard for the accuracy of its Dewatering Claim. At a minimum, Lodge was obligated to examine its records to determine whether the government already paid the costs associated with the dewatering pumps. *UMC Elecs. Co*, 43 Fed. Cl. at 794 ("every party filing a claim before the contracting officer and this court has a duty to examine its records to determine what amounts the government already has paid or whether payments are actually owed[.]"). If it had, Lodge would have discovered it previously billed the Army Corps for the six-month period between July 6, 2011 and January 14, 2012. (Schaeb, TR at 1175:8–15; JX109.209; JX038.008, .031; Gore, TR at 544:3–545:19). In effect, Lodge "double billed" the Army Corps for the dewatering pumps' operating costs. Failure to make a minimum examination of regards satisfies the requisite intent for fraud under the False Claims Act and the Special Plea in Fraud statutes. 31 U.S.C. § 3729; 28 U.S.C. § 2514.

Finally, Lodge's inclusion of the operation costs of the dewatering pumps was not merely an innocent mistake or an inconsistency. *See City of Green Bay*, 168 F.3d at 1018. Lodge conceded it intentionally sought to recover additional dewatering pump costs, above the agreed upon monthly amounts. (Dunn, TR at 972:20–973:6). Lodge included $606,515 in costs related to the dewatering pumps in its cost pool, inclusive of the inefficiency ratio factor and after the 7% profit markup. (Schaeb, TR at 1175:8–22). Before applying those adjustments, Lodge billed the Army Corps for approximately $244,730 in dewatering pump operating costs for which Lodge was already compensated. Accordingly, the Court concludes the United States demonstrated by clear and convincing evidence that, under 31 U.S.C. § 3729 and 28 U.S.C. § 2514, Lodge's Dewatering claim was fraudulent with respect to the dewatering pumps.

### E.  Additional Issues

Having found that Lodge practiced fraud against the United States by submitting false claims for payment that contained statements and records material to those false claims, the Court now turns to the applicable penalties. In addition, Lodge has requested the Court take judicial notice of a decision in an indirectly related case pending in the District of Massachusetts.

### i.  False Claims Act penalties.

Although the United States attempts to quantify the "amount of the fraud" with respect to the Dewatering and Design claims and the misrepresentations therein, the United States does not contend that the Army Corps actually paid the amounts Lodge sought in those claims. (*See* USA Trial Brief at 14–15). Conversely, the parties agree both claims were denied. (JSOF ¶¶ 17, 22). Thus, without proof of actual damages, the Court is constrained to only impose statutory penalties. *Daewoo Eng'g & Const. Co.*, 557 F.3d at 1341.

As discussed above, False Claims Act liability attaches a mandatory civil penalty to both formal claims submitted to the government for payment but also submission of "false record[s] or statement[s] material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(B). The amount of allowable civil penalties is set by reference to two statutes. The False Claims Act itself lists a minimum penalty of "$5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990[.]" § 3729(a)(1).

The Federal Penalties Inflation Adjustment Act revises the penalties upward, pursuant to regulations established by individual agencies. *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 701, 129 Stat 584, 599–600 (2015) (amending the Federal Civil Penalties Inflation Adjustment Act). But "[f]or all violations occurring on or before November 2, 2015," the civil penalties must be no less than $5,500 and no more than $11,000. 28 C.F.R. § 85.3(a)(9) (Department of Justice Regulation). Here, the violations occurred in 2013 when Lodge submitted its false Dewatering and Design claims to the Army Corps. *See Jana, Inc. v. United States*, 41 Fed. Cl. 735, 743 (1998) ("the submission of a false claim, whether or not the claim is paid, *is a violation* of [the False Claims Act] for which the false claimant is liable to the government for civil penalties . . ..") (emphasis added); *see also* 31 U.S.C. § 3731(b)(a) (suggesting a "violation" occurs prior to any legal action instituted to affix liability).

The number of penalties to be assessed depends on the "acts" that violated the False Claims Act and does not necessarily correspond to the number of claims submitted. *See United States v. Bornstein*, 423 U.S. 303, 313 (1976) (explaining how to count False Claims Act violations). Instead, the number of penalties is a fact-bound inquiry in which courts must "focus . . . [on] the specific conduct of the person from whom the Government seeks to collect the statutory [penalties]." *Id.*; *see also Krizek*, 111 F.3d at 939 ("The gravamen of these cases is that the focus is on the conduct of the [party defending the claim]. The Courts asks, 'With what act did the [party defending the claim] submit his demand or request and how many such acts were there?'"). In *Miller v. United States*, 213 Ct. Cl. 59, 72 (1977), the court rejected the United States' argument that "each false item used in reaching a final figure" could be counted separately. Here, the Court finds it appropriate to impose two penalties—one each for fraudulent acts in compiling the Dewatering Claim and the Design Claim.

However, given the extent and egregiousness of the fraudulent costs, particularly with respect to the inefficiency ratio multiplier, the Court exercises its discretion to impose the maximum penalty for each claim. Therefore, the Court assesses and orders Lodge to forfeit to the United States a sum of $22,000 in civil penalties for violations of the False Claims Act, 31 U.S.C. § 3729.

ii.   Special Plea in Fraud penalties.

The Special Plea in Fraud counterclaim is alternatively viewed as an affirmative defense, as it mandates forfeiture of claims tainted by fraud. *Hanover Ins. Co.*, 134 Fed. Cl. at 64 (referring to the United States' 28 U.S.C. § 2514 counterclaim as the "Special Plea in Fraud defense[.]"). Accordingly, the Court is bound to forfeit Lodge's Dewatering and Design claims as causes of action before the Court. *Daewoo Eng'g & Const. Co.*, 557 F.3d at 1341 ("forfeiture under 28 U.S.C. § 2514 requires only part of the claim to be fraudulent."). The Special Plea in Fraud does not carry monetary penalties other than forfeiture.

Lodge's Complaint filed in Case No. 13-800 appeals the Army Corps' denial of its Design Claim. (Case No. 13-800, Compl., ECF No. 1). Despite the withdrawal of its monetary claims, Lodge maintains entitlement to 129 additional calendar days. (Case No. 13-500, Lodge's 2d Am. Compl. at 13, ECF No. 122). That claim must be forfeited in its entirety.[21]

### iii.   Lodge's Motion to Take Judicial Notice.

On September 28, 2021, several weeks after the conclusion of trial, Lodge filed a motion requesting that the Court take judicial notice of a decision in *Hanover Insurance Co. v. United States*, Case No. 20-11989-PBS (D. Mass. Sept. 20, 2021). That case involves Lodge's surety and was formerly consolidated with this case under Case No. 13-500. The court in Massachusetts held that a civil complaint initiating litigation is not a "claim" under either the False Claims Act or the CDA. *Id.* at 11. The court granted summary judgment in favor of Hanover, preventing the United States from pursuing counterclaims in fraud premised on Hanover allowing a subcontractor to pass through certain claims that Hanover had settled with the subcontractor. *Id.* at 1.

Lodge urges the Court to take notice of the District Court's decision dismissing the United States' fraud counterclaims against Hanover Insurance. (Lodge Mot. to Take Notice, ECF No. 86). In response, the United States correctly points out that courts may take judicial notice of facts, but not legal conclusions. (USA Resp. to Take Notice, ECF No. 87). Lodge does not appear to dispute that the Court's discretion to take judicial notice is so limited. (Lodge Reply in Supp., ECF No. 88).

Lodge's Motion is granted-in-part. The Court takes notice that a decision was rendered in *Hanover Insurance Co. v. United States*, Case No. 20-11989-PBS. The Court, with due respect to its colleagues in the District of Massachusetts, notes that it is not bound by that decision or the conclusions contained therein. In addition, the Court need not now express any opinion regarding the pass-through claim issue, nor does it.

## IV.   Decision and Order of Judgment

In brief, Lodge knowingly and intentionally submitted false claims accompanied by false records and statements with respect to the type of equipment it utilized on the project. Lodge's Dewatering and Design claims are fraudulent insomuch as Lodge reported using USACE Manual operating and standby rates for equipment that materially differed from its Euclid R50 dump trucks.

Lodge knowingly and intentionally, or at minimum with reckless disregard for accuracy, utilized an "inefficiency ratio" that was not a reasonable or an accurate measure of inefficiency;

---

[21] Lodge also maintains its appeal of the Army Corps' allegedly wrongful termination for default in Case No. 13-499. (*Id.*; Case No. 13-499, Compl. at 10, ECF No. 1). That claim seeks to convert Lodge's termination for default into a termination for convenience; Lodge is no longer pursuing its Dewatering Claim as a cause of action in the Court of Federal Claims. (Case No. 13-500, Lodge's 2d Am. Compl. at 13). It is not presently clear what, if any, part of Lodge's Complaint in Case No. 13-499 remains viable.

but even if it were, the ratio incorporated days outside of the claim period to inflate its damages calculation. In utilizing this ratio to calculate its Dewatering Claim damages, Lodge submitted a false claim accompanied by false records and statements. Consequently, Lodge's Dewatering Claim is fraudulent.

Lodge knowingly and intentionally, or at minimum with reckless disregard for accuracy, inflated the operation costs of its batch plant by misrepresenting the run-time for that piece of equipment. As a result, Lodge's Dewatering and Design claims are fraudulent in that respect and are accompanied by false records and statements.

Lodge knowingly and intentionally, or at minimum with reckless disregard for accuracy, included costs for running dewatering pumps in its Dewatering Claim despite having already received fixed monthly payments for operating the dewatering pumps. In attempting to double-bill the Army Corps for those costs, Lodge's Dewatering Claim was fraudulent and was accompanied by false records and statements.

After careful consideration of the testimony, documents, and arguments presented at trial, the Court makes the foregoing findings of fact and conclusions of law. In summary:

(1) The Court **FINDS AND CONCLUDES**, with support from clear and convincing evidence, that Lodge Construction, Inc. submitted a fraudulent claim to the United States Army Corps of Engineers on June 21, 2012 (the Design Claim).

(2) The Court **FINDS AND CONCLUDES**, with support from clear and convincing evidence, that Lodge Construction, Inc. submitted a fraudulent claim to the United States Army Corps of Engineers on June 26, 2012 (the Dewatering Claim).

(3) Pursuant to 31 U.S.C. § 3729, Lodge Construction, Inc. is **ORDERED** to pay to the United States $22,000 in civil penalties for false claims, statements, and records associated with Lodge's certified Dewatering and Design claims submitted for payment to the United States Army Corps of Engineers.

(4) Lodge Construction, Inc.'s Design Claim, as stated in Lodge's Complaint, Case No. 13-800, and Lodge's Second Amended Complaint, Case No. 13-500, is **FORFEITED** pursuant to 28 U.S.C. § 2514.

(5) Pursuant to RCFC 54(b), there being no just reason for delay, the Clerk is **DIRECTED** to enter judgment in favor of the United States in Case No. 13-800.

(6) Lodge Construction, Inc.'s Motion to Take Judicial Notice (ECF No. 86) is **GRANTED-IN-PART**.

(7) Further proceedings are required to assess the viability of Lodge's Complaint in Case No. 13-499. In addition, the United States has asserted counterclaims in fraud that were not within the scope of this limited trial. The Court **SCHEDULES** a status conference on February 1, 2022 to address outstanding issues. That status conference will be conducted in Washington, D.C. at the National Courts Building at 2:00 PM (ET).

(8) The Court reserves a decision on costs for a later date.

**IT IS SO ORDERED.**



s/      David A. Tapp
DAVID A. TAPP, Judge